THE STATE OF OHIO, APPELLANT, *v.* JOHNSTON, APPELLEE.

[Cite as State *v.* Johnston (1988), 39 Ohio St. 3d 48.]

(Nos. 86-1547 and 86-1548—Submitted May 1, 1988—Decided October 5, 1988.)

*Christopher E. Veidt,* prosecuting attorney, and *Charles A. Gerken,* for appellant.

*Thomas M. Tyack & Associates Co., L.P.A., Thomas M. Tyack, Robert W. Suhr & Associates* and *Robert W. Suhr,* for appellee.

*Randall M. Dana,* public defender, and *Michael W. Gleespen,* urging affirmance for *amicus curiae* Ohio Public Defender Commission.

LOCHER, J. Having exhaustively examined the record and the issues raised by appellant in the cases before us, it is the decision of this court that the judgments of the court of appeals should, to the extent described herein, be affirmed in part, modified in part, and reversed in part. In the following analysis, we address each case in turn.

No. 86-1547

I

In its first proposition of law, the state contends that the testimony of one of its witnesses, Steven R. Rine, who had been hypnotized prior to trial, was competent, credible and admissible. The court of appeals held that Rine's testimony had not been shown to be sufficiently reliable, and that it had therefore been erroneously admitted.

Over the years, hypnosis has become widely accepted by the relevant scientific and medical communities as a reliable investigative tool.[1] As

---

[1] See, *e.g., Bundy* v. *State* (Fla. 1985), 471 So. 2d 9, 13, certiorari denied sub nom. *Bundy* v. *Florida* (1986), 479 U.S. 894 (hereinafter cited as *"Bundy II"*); *Bundy* v. *State* (Fla. 1984), 455 So. 2d 330, 340, certiorari denied (1986), 476 U.S. 1109 (hereinafter cited as *"Bundy I"*); *State, ex rel. Collins,* v. *Superior Court* (Ariz. 1982), 644 P. 2d 1266, 1295; *State* v. *Hurd* (1981), 86 N.J. 525, 530, 432 A. 2d 86, 90.

the United States Supreme Court recently commented in *Rock* v. *Arkansas* (1987), 483 U.S. ___, ___, 97 L. Ed. 2d 37, 50-51, 107 S. Ct. 2704, 2713-2714:

"Hypnosis by trained physicians or psychologists has been recognized as a valid therapeutic technique since 1958, although there is no generally accepted theory to explain the phenomenon, or even a consensus on a single definition of hypnosis. See Council on Scientific Affairs, Scientific Status of Refreshing Recollection by the Use of Hypnosis, 254 J.A.M.A. 1918, 1918-1919 (1985) (Council Report). [Footnote omitted.] The use of hypnosis in criminal investigations, however, is controversial, and the current medical and legal view of its appropriate role is unsettled.

"Responses of individuals to hypnosis vary greatly. The popular belief that hypnosis guarantees the accuracy of recall is as yet without established foundation and, in fact, hypnosis often has no effect at all on memory. The most common response to hypnosis, however, appears to be an increase in both correct and incorrect recollections. [Footnote omitted.] Three general characteristics of hypnosis may lead to the introduction of inaccurate memories: the subject becomes 'suggestible' and may try to please the hypnotist with answers the subject thinks will be met with approval; the subject is likely to 'confabulate,' that is, to fill in details from the imagination in order to make an answer more coherent and complete; and, the subject experiences 'memory hardening,' which gives him great confidence in both true and false memories, making effective cross-examination more difficult. See generally M. Orne, et al., Hypnotically Induced Testimony, in Eyewitness Testimony: Psychological Perspectives 171 (G. Wells and E. Loftus, eds., 1985); Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness, 68 Calif. L. Rev. 313, 333-342 (1980). Despite the unreliability that hypnosis concededly may introduce, however, the procedure has been credited as instrumental in obtaining investigative leads or identifications that were later confirmed by independent evidence. See, *e.g., People* v. *Hughes,* 59 N.Y. 2d 523, 533, 453 N.E. 2d 484, 488 (1983); see generally R. Udolf, Forensic Hypnosis 11-16 (1983)."

Because of the limited scientific understanding of hypnosis and its effects on memory, and because of the uncertainty as to the reliability of its results, courts have had trouble accepting evidence obtained through hypnosis. Generally, those courts that have addressed the subject have divided the testimony of a witness who has been hypnotized into three categories for purposes of ruling on its admissibility: testimony supplied while under hypnosis, testimony regarding matters recalled prior to hypnosis, and testimony that has been refreshed by hypnosis.

A

As to the first category, the consensus among the courts is that testimony supplied by a witness under hypnosis is inadmissible *per se.* See, *e.g., Harker* v. *Maryland* (C.A. 4, 1986), 800 F. 2d 437, 441, citing *State* v. *Collins* (1983), 296 Md. 670, 681, 464 A. 2d 1028, 1034; *People* v. *Shirley* (1981), 31 Cal. 3d 18, 33, 181 Cal. Rptr. 243, 251, 641 P. 2d 775, 783, certiorari denied (1982), 459 U.S. 860. In the case *sub judice,* Rine did not testify while under hypnosis.

B

Regarding the second category, most courts have ruled that testimony

of a witness who has undergone hypnosis is admissible if it relates to matters recalled prior to hypnosis, so long as its independence is reliably shown. See, e.g., *State, ex rel. Collins,* v. *Superior Court* (1982), 132 Ariz. 180, 209-210, 644 P. 2d 1266, 1295-1296.[2] But, see, *People* v. *Shirley, supra.* This court previously addressed this question in *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 15 OBR 379, 473 N.E. 2d 768. Therein, we held that testimony supplied by a witness regarding events recalled and related prior to and independent of hypnosis is admissible if the trial court determines that the proposed testimony is substantially in conformance with the pre-hypnosis memory of the witness. *Id.* at 260, 15 OBR at 397-398, 473 N.E. 2d at 788, and at fn. 16.

In the case at bar, the only record of Rine's pre-hypnosis memory consists of some non-verbatim, handwritten notes by the interviewing officer. The notes were not signed or initialed by Rine at the time. Nevertheless, the trial court found that the events Rine related to the police prior to hypnosis were consistent with the contents of his post-hypnosis statement.[3] The trial court ruled that Rine could testify about his pre-hypnosis recollections, that appellee could test Rine's pre-hypnosis recall through cross-examination, and that appellee could present expert testimony on the effects of hypnosis on memory. For the most part, Rine's testimony on direct examination was faithful to his recollection as noted by the police prior to hypnosis. His testimony differed from his pre-hypnosis statements to the police only insofar as he added a few details not accounted for in the interviewing officer's notes.

Upon review of the record, we find that the trial court did not abuse its discretion in allowing Rine to testify about matters as he recalled them prior to being hypnotized. In view of the trial court's express finding that Rine's pre-hypnosis memory, as reflected in the police notes, was consistent with his post-hypnosis statement, the trial court's decision to admit this testimony was not unreasonable, arbitrary, or unconscionable. *Ojalvo* v. *Bd. of Trustees of Ohio State Univ.* (1984), 12 Ohio St. 3d 230, 232, 12 OBR 313, 315, 466 N.E. 2d 875, 877.[4]

---

[2] See *Contreras* v. *State* (Alaska 1986), 718 P. 2d 129; *Harker* v. *Maryland, supra*; *Clay* v. *Vose* (C.A. 1, 1985), 771 F. 2d 1, certiorari denied (1986), 475 U.S. 1022; *Bundy II, supra*; *Bundy I, supra*; *People* v. *Nixon* (1984), 421 Mich. 79, 364 N.W. 2d 593; *State* v. *Martin* (1984), 101 Wash. 2d 713, 684 P. 2d 651; *Robison* v. *State* (Okla. Crim. App. 1984), 677 P. 2d 1080; *Commonwealth* v. *Kater* (1983), 388 Mass. 519, 447 N.E. 2d 1190; *State* v. *Patterson* (Neb. 1983), 331 N.W. 2d 500; *People* v. *Hughes* (1983), 59 N.Y. 2d 523, 453 N.E. 2d 484; *Commonwealth* v. *Taylor* (1982), 294 Pa. Super. 171, 439 A. 2d 805; *People* v. *Quintanar* (Colo. App. 1982), 659 P. 2d 710; *State* v. *Koehler* (Minn. 1981), 312 N.W. 2d 108; *State* v. *Hurd, supra.*

[3] A few days after the second of two hypnosis sessions, Rine made and signed a post-hypnosis statement.

[4] We note, however, that the party intending to offer the testimony of a witness regarding events prior to hypnosis should conduct a pre-hypnosis interview of the witness. The interview should be recorded, at a minimum in writing, and should cover the substance of the witness' pre-hypnosis recollection of the events in question. Such recordation will allow the trial court to determine whether the testimony at trial conforms to the witness' pre-hypnosis memory, and will also enable the trial court to determine the effects, if any, of the hypnosis on the witness' memory. Failure to

### C

With respect to the third category, courts have gone four different ways in ruling on the admissibility of testimony refreshed by hypnosis.

One approach has been to consider the testimony of a witness who has been examined under hypnosis prior to trial to be inadmissible *per se.* These courts have so held either because the technique of hypnotic memory enhancement has not been established under *Frye* v. *United States* (C.A. D.C. 1923), 293 F. 1013 (evidence derived from new scientific techniques not admissible until the technique achieves general acceptance by scientists in the relevant field),[5] or because the scientifically recognized dangers of such testimony's unreliability outweigh its probative value as a matter of law. See, *e.g., People* v. *Shirley, supra.*[6]

The second approach some courts have taken is to rule hypnotically refreshed testimony admissible *per se* and to consider the problems inherent in the use of hypnosis as a matter of credibility. These courts rely on cross-examination and expert testimony on hypnosis to determine the reliability of the hypnotic procedures used in each case. See, *e.g., Harding* v. *State* (1968), 5 Md. App. 230, 246 A. 2d 302, certiorari denied (1969), 395 U.S. 949.[7]

The third approach followed by some courts is one of conditional admissibility. These courts admit hypnotically refreshed testimony only if they find it appropriate under the circumstances and only if strict procedural safeguards were followed during the hypnotic session in order to ensure reliability. See, *e.g., State* v. *Hurd* (1981), 86 N.J. 525, 432 A. 2d 86.[8] This

---

provide such recordation may, at the discretion of the trial court, result in the exclusion of the proposed testimony.

[5] It has been persuasively argued that the *Frye* test was silently abolished by the adoption of the Federal Rules of Evidence. See Note, Excluding Hypnotically Induced Testimony on the "Hearsay Rationale" (1986), 20 Val. U. L. Rev. 619, 624, citing Saltzburg & Redden, Federal Rules of Evidence Manual (3 Ed. 1982) 452; Wright & Graham, 22 Federal Practice & Procedure: Evidence (1978), Section 5168; and Giannelli, The Admissibility of Novel Scientific Evidence: *Frye* v. *United States,* a Half-Century Later (1980), 80 Colum. L. Rev. 1197, 1229.

[6] See *Contreras* v. *State, supra; State* v. *Davis* (Del. Super. 1985), 490 A. 2d 601; *State* v. *Moreno* (Hawaii 1985), 709 P. 2d 103; *State* v. *Haislip* (1985), 237 Kan. 461, 701 P. 2d 909, certiorari denied (1985), 474 U.S. 1022; *Alsbach* v. *Bader* (Mo. 1985), 700 S.W. 2d 823; *Bundy I, supra; People* v. *Nixon, supra; State* v. *Peoples* (1984), 311 N.C.

515, 319 S.E. 2d 177; *State* v. *Martin, supra; Robison* v. *State, supra; Peterson* v. *State* (Ind. 1983), 448 N.E. 2d 673; *State* v. *Collins, supra; Commonwealth* v. *Kater, supra; People* v. *Hughes, supra; State, ex rel. Collins,* v. *Superior Court, supra; People* v. *Quintanar, supra; State* v. *Blanchard* (Minn. 1982), 315 N.W. 2d 427; *Commonwealth* v. *Nazarovitch* (1981), 496 Pa. 97, 436 A. 2d 170; *Greenfield* v. *Commonwealth* (1974), 214 Va. 710, 204 S.E. 2d 414.

[7] See *Beck* v. *Norris* (C.A. 6, 1986), 801 F. 2d 242; *State* v. *Wern* (La. 1983), 425 So. 2d 756; *State* v. *Brown* (N.D. 1983), 337 N.W. 2d 138; *Chapman* v. *State* (Wyo. 1982), 638 P. 2d 1280; *State* v. *Glebock* (Tenn. Crim. App. 1981), 616 S.W. 2d 897; *United States* v. *Awkard* (C.A. 9, 1979), 597 F. 2d 667, certiorari denied (1979), 444 U.S. 885; *Creamer* v. *State* (1974), 232 Ga. 136, 205 S.E. 2d 240; *State* v. *Brom* (1972), 8 Ore. App. 598, 494 P. 2d 434.

[8] See *Sprynczynatyk* v. *General Motors Corp.* (C.A. 8, 1985), 771 F. 2d 1112, cer-

approach was adopted by the Court of Appeals for the Twelfth Appellate District in *State* v. *Weston* (1984), 16 Ohio App. 3d 279, 16 OBR 309, 475 N.E. 2d 805, and by the court of appeals below.

The fourth and most recent approach has been to conduct an individualized inquiry as to the admissibility of hypnotically refreshed testimony in each case. These courts eschew the *per se* rules of admissibility in favor of a more flexible approach that takes into account all the circumstances affecting the reliability of such testimony on a case-by-case basis. See, *e.g., State* v. *Iwakiri* (1984), 106 Idaho 618, 682 P. 2d 571.[9]

In the instant case, we find it necessary to adopt one of these approaches. The trial court originally ruled that Rine could not testify about anything but his pre-hypnosis recollection. However, the trial court later ruled that Rine could answer questions relating to his hypnotically refreshed memory.[10] After careful consideration, we are convinced that the approach requiring courts to conduct an individualized inquiry in each case is the most meritorious of the four. This approach was pioneered by the Idaho Supreme Court in *State* v. *Iwakiri, supra.* In rejecting the other approaches to the admissibility of hypnotically refreshed testimony, that court reasoned as follows:

"While each of the three approaches * * * have [*sic*] merit, they all advocate to a greater or lesser extent a *per se* rule of admissibility or inadmissibility which is inconsistent with the general trend of witness competency that every person is competent to be a witness. While each of the three approaches focuses on an important consideration to be evaluated by a trial court in determining competency, they do so to the exclusion of other considerations, and thus unnecessarily tie a trial court's hands in determining the competency of a witness to testify. If we were to adopt the rule that hypnotically induced testimony should be left to cross examination and impeachment, there would still be circumstances where testimony admitted under that rule had been rendered tainted and unreliable due to the methods used in hypnosis. Thus, a *per se* rule of admissibility would in some circumstances allow for the admission of unreliable testimony, an undesirable result in our judicial system, where we strive to reach verdicts based only on reliable testimony. On the other hand, a *per se* rule of inadmissibility * * * would, in some circumstances, disallow reliable testimony, thus thwarting the truthseeking function of our judicial system.[11] Finally, the third line of authority adopting safeguards to be used in hypnotic sessions, could also represent a *per se* rule if it were inter-

---

tiorari denied (1986), 475 U.S. 1046; *House* v. *State* (Miss. 1984), 445 So. 2d 815; *United States* v. *Valdez* (C.A. 5, 1984), 722 F. 2d 1196; *United States* v. *Harrington* (A.C.M.R. 1984), 18 M.J. 797; *State* v. *Seager* (Iowa 1983), 341 N.W. 2d 420; *State* v. *Armstrong* (1983), 110 Wis. 2d 555, 329 N.W. 2d 386, certiorari denied (1983), 461 U.S. 946; *State* v. *Beachum* (App. 1981), 97 N.M. 682, 643 P. 2d 246, writ quashed (N.M. 1982), 644 P. 2d 1040.

[9] See *McQueen* v. *Garrison* (C.A. 4,

1987), 814 F. 2d 951 (reliability evaluation); *Wicker* v. *McCotter* (C.A. 5, 1986), 783 F. 2d 487 (probative value weighed against prejudicial effect of testimony).

[10] The trial court ruled that, in attempting to impeach Rine on cross-examination with his post-hypnosis statement, the defense had opened the door for Rine to testify freely as to both his pre- and post-hypnosis recollection.

[11] In addition, we note that the United

preted to mean that, if the safeguards were followed, the testimony is always admissible, and if the safeguards were not followed the testimony is never admissible. We foresee circumstances where, even when the safeguards are not strictly or entirely followed, a trial court could nevertheless conclude that the testimony would still be sufficiently reliable for its admission. For example, one of the safeguards * * * [might be] that only the hypnotist and the subject should be present during any phase of the hypnotic session. However, strict compliance at all times with this safeguard would prevent a criminal defendant from seeking the self protection of the presence of his attorney, or even prevent a person from requesting that his or her own psychiatrist be present to observe the session. In this case, the presence of a third person would protect the rights of a subject, but at the same time would not necessarily render the entire testimony unreliable. Thus, merely because one of the safeguards was not followed should not result in the automatic exclusion of the entire testimony." (Footnote added.) *Id.* at 624-625, 682 P.2d at 577-578.

The *Iwakiri* court then developed its own approach for determining the admissibility of hypnotically refreshed testimony, seeking to "protect against the dangers of hypnosis, particularly the dangers of cueing and confabulation, and yet allow for receipt of the benefits of memory recall which hypnosis can produce." *Id.* at 625, 682 P. 2d at 578. The court ruled that in cases where hypnotically refreshed testimony is offered, trial courts should hold a pretrial hearing and apply a "totality of the circumstances" test to determine the reliability of the proposed testimony. *Id.*

We find that this approach, which allows trial courts to consider all factors relevant to the reliability of the hypnotically refreshed testimony on a case-by-case basis, is the best solution to date to the problems posed by such testimony. Accordingly, we hold that testimony supplied by hypnosis prior to trial is admissible only if the trial court determines that, under the totality of the circumstances, the proposed testimony is sufficiently reliable to merit admission.

This inquiry should be addressed by a trial court in a pretrial hearing in each case that such testimony is offered.[12] During this hearing, the trial court may consider the following guidelines in deciding whether, under the totality of the circumstances, the proposed testimony should be admitted.[13] These guidelines should be considered prerequisites to admissibility,

---

States Supreme Court frowned upon *per se* rules of admissibility with respect to hypnotically refreshed testimony in *Rock* v. *Arkansas, supra.* Therein, the court stated that "[a] State's legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case." *Id.* at ___, 97 L. Ed. 2d at 52, 107 S. Ct. at 2714. The court went on to hold such a rule unconstitutional where the defendant is the witness who was hypnotized.

[12] Consequently, parties intending to offer hypnotically refreshed testimony should give timely notice to the opposing party or parties and the trial court prior to trial.

[13] These guidelines are for the most part based on those developed by Dr. Martin Orne, an expert on hypnotically refreshed testimony, to ensure a minimum level of reliability. See Orne, The Use and Misuse of Hypnosis in Court (1979), 27 Intl. J. Clinical & Experimental Hypnosis 311, 335-336. See, also, *State* v. *Hurd, supra,* at 545-546, 432 A. 2d at 96-97; *State* v. *Iwakiri, supra,* at 624, 682 P. 2d at 577.

In addition, we note that in *State* v. *Souel* (1978), 53 Ohio St. 2d 123, 7 O.O. 3d

but they are not exclusive of any other procedures designed to promote reliability:

(a) The hypnosis session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis, to ensure the most accurate recall possible.

(b) The qualified professional conducting the hypnosis session should be independent from any of the parties in the case, to avoid any biased procedures or questions.

(c) Any information given to the hypnotist by any of the parties to the case prior to the hypnosis session should be recorded, at a minimum in writing, so that the trial court can determine the extent to which the subject may have received any information from the hypnotist.

(d) Before the hypnosis session, the hypnotist should obtain a description of the facts from the subject, avoiding adding new elements to the subject's description, so that the trial court can compare the subject's pre- and post-hypnotic recollection.

(e) The hypnosis session and all other contact between the hypnotist and the subject should be recorded, preferably on video tape, so that a permanent record is available to reveal the presence of any suggestive procedures or questions.

(f) Generally, only the hypnotist and the subject should be present during the hypnosis session, in order to protect against inadvertent influence. However, other persons may be present if their attendance is necessary and steps are taken to prevent their influencing the results of the session.

In examining the totality of the circumstances, the trial court may consider any other factors affecting the reliability of the proposed testimony, such as the presence of conflicting or corroborating evidence independent of the proposed testimony, the appropriateness of using hypnosis to restore the subject's memory, and any discernible motivation the subject might have for remembering or forgetting the events in question. At trial, the trial court should give wide latitude to the party opposing the testimony in cross-examining the witness, and should provide the jury, if any, with a cautionary instruction explaining the potential dangers of hypnosis.

The conditions under which Rine was hypnotized in this case fulfill none of the above-suggested guidelines. While there may be cases where hypnotically refreshed testimony may be found to be sufficiently reliable for admission in the absence of any compliance with the guidelines, such cases would be very unusual.[14] This does not appear to be such a case, since no other indicia of reliability exist here which would justify the admission of the testimony. See State v. Iwakiri, supra, at 626, 682 P. 2d at 579.

Furthermore, although the trial court had originally addressed the issue of the reliability of Rine's testimony as to his pre-hypnosis memory, it failed to address the issue of the reliability of Rine's hypnotically refreshed testimony when it later ruled Rine could testify freely. The hypnosis sessions had been recorded on audio tapes, yet the trial court did not listen to these tapes before admitting Rine's hypnotically refreshed testimony. While defense counsel did not object to the contents of these tapes, it was the responsibility of the trial court to

207, 372 N.E. 2d 1318, this court adopted a series of conditions to be met before the results of a polygraphic examination could be admitted in a criminal trial.

[14] Likewise, it would also be unusual for such testimony to be excluded where all of the guidelines have been followed.

determine whether anything recorded on them rendered Rine's testimony insufficiently reliable to be admitted. We therefore find that the trial court abused its discretion in permitting Rine to testify about his post-hypnosis recollection. Upon retrial, the trial court should conduct a pretrial hearing placing the burden on appellant, as the offering party, to demonstrate by clear and convincing proof that, under the totality of the circumstances, Rine's hypnotically refreshed memory is sufficiently reliable to warrant admission.

Accordingly, appellant's first proposition of law is overruled.

## II

In its second proposition of law, appellant argues that the court of appeals was required to conduct its independent review under R.C. 2929.05 (A) regardless of the trial court's failure to explain its findings upon the evidence in mitigation.

The court of appeals found that it could not perform its statutory review function because the trial court failed to supply findings on the existence of any mitigating factors as well as the reasons for its conclusion that the aggravating circumstances outweighed the mitigating factors.

R.C. 2929.03(F) sets forth the duties of a three-judge panel in imposing the death sentence. In relevant part, that statute provides:

"The * * * panel of three judges, when it imposes the sentence of death, *shall* state in a separate opinion its specific findings as to the existence of any mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of com-

mitting were sufficient to outweigh the mitigating factors. * * *" (Emphasis added.) See, also, *State* v. *Maurer, supra,* at paragraph three of the syllabus.

On appeal, a reviewing court must determine the appropriateness of imposing a death sentence by considering whether the sentence is excessive as well as, after independently weighing the evidence, whether the aggravating circumstances outweigh beyond a reasonable doubt the mitigating factors presented by the defendant. R.C. 2929.05(A). A concomitant aspect of that review is a determination as to whether the sentencing court properly weighed the mitigating factors against the aggravating circumstances. *State* v. *Maurer, supra,* at 246, 15 OBR at 385, 473 N.E. 2d at 777.

In *Maurer,* the trial court had complied with the statute in part, by summarizing the evidence and specifying the mitigating factors and aggravating circumstances it found to exist. We held that although the trial court erred by not fully complying with R.C. 2929.03(F), the defendant was not prejudiced and the error did not require reversal. *Id.* at 247, 15 OBR at 386, 473 N.E. 2d at 778. Nevertheless, we made the following caveat:

"In so holding we do not intend to trivialize the duty of the trial court under R.C. 2929.03(F) to articulate its reasoning or to suggest that such an omission is insignificant. It is not. The failure of a trial court to comply with this aspect of R.C. 2929.03(F) disrupts the review procedures enacted by the General Assembly by depriving the defendant and subsequent reviewing courts of the trial court's perceptions as to the weight accorded all relevant circumstances. In a closer case, those perceptions could make a difference in the manner in which a defendant pur-

sues his appeal and in which a reviewing court makes its determination." *Id.*

Here, the trial court found that the aggravating circumstances of the crimes appellee was found guilty of committing outweighed the evidence of any of the mitigating factors presented by appellee.[15] However, the trial court failed to specify either what evidence it found to be mitigating or its rationale for stating that such evidence did not outweigh the aggravating circumstances. In failing to fully comply with R.C. 2929.03(F), the trial court erred. Nevertheless, appellee has not shown that he was prejudiced by this error in any way. This is simply not the "closer case" referred to in *Maurer.* Thus we conclude that, under the circumstances of this case, the court of appeals erred in holding that appellee had been prejudiced by the trial court's failure to comply with R.C. 2929.03(F).

While the court of appeals may have been impaired to some extent by the trial court's inadequate opinion, it was still required to conduct an *independent* review of the evidence and the record. R.C. 2929.05(A) specifies that appellate courts must "independently weigh all of the *facts and other evidence disclosed in the record* in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate." (Emphasis added.) Appellate courts may not therefore rely solely on the opinions of

trial courts in independently reviewing capital cases to determine whether the death sentence is appropriate. Accordingly, we sustain appellant's second proposition of law.

The judgment of the court of appeals in case No. 86-1547 is hereby modified with respect to the admission of the testimony of the hypnotized witness, and reversed with respect to the compliance of the trial court with R.C. 2929.03(F).

### No. 86-1548

In this case, appellant raises several challenges to the review by the court of appeals of appellee's motion for a new trial, which the trial court denied.

### I

Appellant's first two propositions of law assert that appellee's motion for a new trial was untimely, and that therefore the merits of the motion were not properly before the court of appeals.

The time within which a motion for a new trial must be filed is dictated by Crim. R. 33(B):

"Application for a new trial shall be made by motion which, except for the cause of newly discovered evidence, shall be filed within fourteen days after the *verdict* was rendered, or the decision of the court where a trial by jury has been waived, unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for new trial, in which case the motion shall be filed within seven days

---

[15] The trial court stated, in pertinent part, that:

"This Panel considered all mitigating factors set forth in ORC 2929.04(B), the existence of any other mitigating factors and the Aggravating Circumstances found to

exist by the Panel as well as all the evidence adduced at trial. As a result, the Panel has determined that the Aggravating Circumstances outweigh the mitigating factors, beyond a reasonable doubt."

from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein.

"Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the *verdict* was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period." (Emphasis added.)

Although appellee's motion contained allegations both of newly discovered evidence and of prosecutorial misconduct, appellee chose to pursue the motion under Crim. R. 33(A)(6) as being based on newly discovered evidence.[16] Accordingly, appellee was required by Crim. R. 33(B) to file the motion either within one hundred twenty days after the journalization of the guilty verdict, or within seven days after securing an order from the trial court finding he was unavoidably delayed from filing it in a timely fashion. Appellee failed to comply with either of these requirements.

The court of appeals opined that, because of the bifurcation of capital trials, and because of the language of R.C. 2929.03(F) to the effect that a judgment in a capital case is not final until the court's opinion is filed, the time limits in Crim. R. 33(B) do not begin to run in a capital case until the day after the trial court issues the sentence. However, we find nothing in the rule which makes its directives any less applicable in capital trials than in any other criminal prosecutions. In addition, the rule unambiguously states that the time periods for filing begin to run after the finder of fact reaches a *verdict*. Consequently, no other statute, such as R.C. 2929.03(F), need be consulted in order to interpret the meaning of the rule. The decision of the court of appeals is overruled to the extent that it holds otherwise.

While we agree that, technically, appellee's motion for a new trial was untimely, we cannot agree with appellant's contention that the court of appeals was precluded from reaching its merits. It would have been within the discretion of the trial court to overrule the motion on procedural grounds. However, the trial court overlooked the timeliness issue and proceeded to dispose of the motion on the merits. In reaching the merits, the trial court implicitly found that appellee was unavoidably prevented from filing the motion within the Crim. R. 33(B) time limits.[17] We do not find that the trial

---

[16] Appellant contends that appellee was required to file a separate motion under Crim. R. 33(A)(2) on the issue of prosecutorial misconduct, and that pursuant to Crim. R. 33(B), appellee was required to do so within fourteen days after the entry of the guilty verdict, or within seven days after the entry of an order finding he was unavoidably delayed from timely filing the motion. We disagree. As the court of appeals found, the newly discovered evidence and prosecutorial misconduct alleged by appellee's motion were so intertwined that it would be inequitable to restrict the time for filing this motion to the fourteen-day period provided in Crim. R. 33(B). Furthermore, we see no profit in requiring appellee to have filed two separate motions where one was clearly sufficient.

[17] In its opinion, the trial court stated in part that:

court's handling of the matter in this fashion constituted an abuse of discretion. See *Ojalvo* v. *Bd. of Trustees of Ohio State Univ.*, *supra*. Because the trial court properly addressed the merits of appellee's motion, the court of appeals was entitled to review the merits of the motion as well.

Appellant further maintains that the court of appeals' ruling on the prosecutorial misconduct issue was improper because the issue was not raised or considered at the trial level. The record, however, refutes appellant's contention. A review of the trial court's opinion and the memoranda in support of appellee's motion discloses that the prosecutorial misconduct issue was indeed argued before and considered by the trial court.[18] Consequently, the court of appeals' consideration of this issue was not inappropriate.

Appellant also urges that the court of appeals failed to apply the correct standard for reviewing motions for new trials. Specifically, appellant argues that the appellate court should have applied an abuse of discretion test rather than a due process analysis. Appellant's contention presupposes that the trial court only addressed the issue of newly discovered evidence. In such a case, the abuse of discretion test would have been appropriate. However, as discussed above, the trial court also considered the issue of prosecutorial misconduct. In reviewing the merits of appellee's motion, then, the court of appeals was required to utilize a due process analysis, and properly did so. Furthermore, the trial court relied on Crim. R. 33 in reaching its decision. That rule requires that a determination be made as to whether a defendant's substantial rights have been materially affected. Appellee's right to a fair trial was before the trial court, and therefore the application by the court of appeals of a due process standard was not improper.

Finally, appellant objects to the use by the court of appeals of legal arguments that were not raised or considered at the trial level, namely that appellee was denied a fair trial under the holding of *Brady* v. *Maryland* (1963), 373 U.S. 83, and its progeny. This argument was briefed by appellee in the appeal of his conviction, and incorporated by reference in his appellate brief below.[19] Appellant asserts

---

"While it is * * * apparent that the time requirements of * * * Criminal Rule 33 have not been complied with, *this court will assume that they have been in order to avoid any undue delay* in determining the ultimate issue of whether or not any material evidence justifying a new trial has been found or discovered." (Emphasis added.)

By "any undue delay," the trial court was presumably referring to the delay that would have resulted from having a hearing on whether appellee was unavoidably prevented from timely filing the motion.

[18] The trial court's opinion provides, in relevant part, as follows:

"Defense counsel contend that most, if not all, of the evidence proffered in support of their motion *was withheld by the prosecuting attorney* and therefore not available to them during the course of the trial. We find this contention unsupported by the facts and can find nothing which would indicate that the State failed to comply with Criminal Rule 16 or *withheld anything that could be construed as being favorable to the defendant.* [Footnote omitted.]" (Emphasis added.)

[19] Appellee's second assignment of error before the court of appeals in this case referred to his fourth assignment of error before the court of appeals in the appeal of his conviction. Beyond this reference, appellee did not repeat the analysis provided in the former appeal.

that this "borrowing" by the court of appeals of legal arguments and authority from the prior appeal was improper. App. R. 12 permits an appellate court to pass judgment upon even those errors not assigned by the parties. See, *e.g., C. Miller Chevrolet* v. *Willoughby Hills* (1974), 38 Ohio St. 2d 298, 301, 67 O.O. 2d 358, 360, 313 N.E. 2d 400, 403. However, "[i]n fairness to the parties, a court of appeals which contemplates a decision upon an issue not briefed should * * * give the parties notice of its intention and an opportunity to brief the issue." *Id.* at fn. 3. Also, the appellate court should limit its review to what transpired in the trial court as reflected by the record. See *State* v. *Ishmail* (1978), 54 Ohio St. 2d 402, 405-406, 8 O.O. 3d 405, 407, 377 N.E. 2d 500, 502. Herein, the consideration afforded appellee's *Brady* claim was not unfair. The court of appeals received both parties' arguments on this constitutional question in its review of the conviction. Additionally, the court limited its review to the record.[20] As a result, we find no merit in appellant's argument.

Appellant's first and second propositions of law are therefore overruled.

## II

The state's third proposition of law asserts that the court of appeals erred in finding that the trial court should have granted appellee's motion for a new trial. The state submits that the trial court's ruling could not be reversed unless the appellate court found that the trial court abused its discretion. As discussed above, the court of appeals properly applied a due process analysis rather than an abuse of discretion test because the issue on review

concerned appellee's due process right to a fair trial, namely the suppression by the prosecution of evidence favorable to appellee. In such a case, "the usual standards for new trial are not controlling because 'the fact that such evidence was available to the prosecution and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial.'" *United States* v. *Kelly* (C.A.D.C. 1986), 790 F. 2d 130, 135, citing *United States* v. *Agurs* (1976), 427 U.S. 97, 111. For that reason, the defense does not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal, the standard generally used to evaluate motions filed under Crim. R. 33. *United States* v. *Agurs, supra.*

When the prosecution withholds material, exculpatory evidence in a criminal proceeding, it violates the due process right of the defendant under the Fourteenth Amendment to a fair trial. As the United States Supreme Court held in *Brady* v. *Maryland, supra,* at 87, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

Thus, the key issue in a case where exculpatory evidence is alleged to have been withheld is whether the evidence is material. In reviewing appellee's motion for a new trial, the court of appeals analyzed the materiality of the evidence in question under the standards set forth by the court in *United States* v. *Agurs, supra.* In *Agurs,* the United States Supreme Court pro-

---

[20] Inasmuch as the court of appeals decided the merits of appellee's conviction and motion for a new trial on the same day, it presumably had the benefit of the entire record in passing upon the *Brady* issue.

vided a different materiality test to be applied depending on whether the case involved perjured testimony, a specific request by the defense for exculpatory evidence, or a general or no request by the defense for exculpatory evidence. *Id.* at 103-107. However, the court of appeals failed to note that, in *United States* v. *Bagley* (1984), 473 U.S. 667, the United States Supreme Court reformulated the materiality test to be applied in suppression cases. In relying exclusively on the *Agurs* standards, the court of appeals erred.

In *United States* v. *Bagley, supra,* at 682, the court ruled that in determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." See, also, *Pennsylvania* v. *Ritchie* (1987), 480 U.S. 39, 57.

Additionally, the court held that this standard of materiality applies regardless of whether the evidence was specifically, generally or not at all requested by the defense.[21] *United States* v. *Bagley, supra,* at 682. Since *Bagley,* the "reasonable probability" test has been held to apply in all cases where the defense alleges the prosecution improperly suppressed exculpatory evidence. See, *e.g., United States* v. *Peltier* (C.A. 8, 1986), 800 F. 2d 772, 775; *Lindsey* v. *King* (C.A. 5, 1985), 769 F. 2d 1034, 1041; *United States, ex rel. Smith,* v. *Fairman* (C.A. 7, 1985), 769 F. 2d 386, 393.

Having reviewed the evidence alleged to have been suppressed, we conclude that there is a reasonable probability that the outcome of the trial would have been different had some of the evidence been disclosed to the defense. In particular, we find our confidence in the trial court's verdict to be undermined by the state's failure to disclose evidence concerning (1) the possibility that the murders may have occurred at a location other than appellee's farm, and (2) the possibility that another person may have been responsible for the victims' deaths.[22]

---

[21] The court stated that the specificity of the request by the defense should not require different standards of materiality because under the new standard:

"[T]he reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response." *United States* v. *Bagley, supra,* at 683.

[22] Appellant argues that it complied with appellee's request for this information by providing a list of the names and potential witnesses. We disagree. This argument only has validity when the substance of the testimony or statements by these witnesses is provided along with their names and addresses, see *Hughes* v. *Hopper* (C.A. 5, 1980), 629 F. 2d 1036, 1039; *United States* v. *Jones* (C.A. 5, 1983), 712 F. 2d 115, 122, or when their testimony is a matter of public record, see *United States* v. *O'Dell* (C.A. 6, 1986), 805 F. 2d 637, 641. Neither situation is involved here.

Furthermore, we find no merit in appellant's argument that its constitutional argument to disclose exculpatory evidence was extinguished by the trial court's ruling, under Crim. R. 16(B)(1)(g), that the statements of testifying witnesses would be

Initially, the state could have, but did not, reveal evidence indicating that the victims may have been killed at the cornfield in which their limbs and heads were later found.[23] This evidence is material because it tends to contradict the state's theory that appellee killed and dismembered the victims at his farm prior to transporting the bodies to the cornfield. While such evidence may appear to be of relatively minor importance in the total context of the case, such evidence may be sufficient to raise a reasonable doubt where the validity of the verdict is questionable or where, as here, the verdict is based on circumstantial evidence. See *United States, ex rel. Marzeno*, v. *Gengler* (C.A. 3, 1978), 574 F. 2d 730, 736-737; *Wagster* v. *Overberg* (C.A. 6, 1977), 560 F. 2d 735; *United States* v. *Stifel* (N.D. Ohio 1984), 594 F. Supp. 1525, 1540.

More importantly, the state also withheld evidence supplied by a number of witnesses to the effect that another person, Kevin "Tex" Myers, may well have been responsible for killing Todd and Annette.[24] This evidence is material because had it been dis-

---

offered for inspection following direct examination. None of the witnesses who supplied information allegedly suppressed by the prosecution testified at trial. Accordingly, the defense had no opportunity to review their statements.

[23] This evidence includes information supplied by the following witnesses:

Shirley Frazier claims that in the late afternoon on October 4, 1982, she saw a blonde girl with shoulder-length hair, a lanky, brunette boy, and a taller, adult male with dark hair and eyes and dark coveralls enter the cornfield. She then heard a series of gunshots, followed by a girl's voice screaming, "My God, you've killed him" or "My God, you've shot him," and more gunshots. Shortly thereafter the adult male left the cornfield. Parenthetically, we note that Frazier appears to have undergone hypnosis prior to making this statement. Upon retrial, her testimony would be subject to the admissibility requirements outlined herein.

Clarence Mason stated that he heard loud voices and "partying" in the cornfield at about 2:00 a.m. on or about October 5, 1982.

Charles Blosser signed (and later recanted) a statement indicating he saw a blonde girl and a brunette boy naked in the cornfield at approximately 4:45 p.m. (presumably on October 4, 1982).

John Bartow signed a statement to the effect that he heard a series of "shots," followed by a short pause, and then another series of "shots" coming from the cornfield on October 4, 1982, at about 5:45 p.m.

[24] Evidence linking Myers to the crimes was provided by the following witnesses:

Jill Wolfery and her husband, who employed Myers at a private animal park, stated that Myers had known and might have been attracted to Annette, that he had experience in slaughtering and butchering animals, that he had access to animal feedbags such as those found at the burial site in the cornfield, that he had surmised that the victims had been shot with a .22 caliber weapon before that fact was generally known, and that he had told Wolfery that he had been tempted to run away when the police approached him in order to ask about his knowing Annette. He further indicated he could not establish his whereabouts on October 4, 1982.

Michael Metzger, co-owner of the animal park, stated that Myers had been absent all day on October 4, 1982, returning sometime between 6:00 p.m. and 8:00 p.m. Metzger also claimed that Myers had killed and eaten dogs and cats, that he had once threatened to shoot Jill Wolfery after exposing himself to her, and that he had packed up and left soon after the police had questioned him.

An investigator named R. Snyder apparently typed an unsigned report including information that Myers had been treated for a back injury shortly after the victims' disappearance.

closed, the trial court could have been able to reconcile the state's evidence with a reasonable theory of appellee's innocence. As we held in the syllabus in *State* v. *Kulig* (1974), 37 Ohio St. 2d 157, 66 O.O. 2d 351, 309 N.E. 2d 897, "[c]ircumstantial evidence relied upon to prove an essential element of a crime must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt."

For these reasons, we find that our confidence in the trial's outcome has been undermined. Had the state disclosed these items of exculpatory evidence, we believe the result of the trial might have been different. Accordingly, we affirm the judgment of the court of appeals remanding the cause for a new trial.

It could be argued that this is a close case and that upon remand, the trial court may likely come to the same conclusion that it did before. Nevertheless, it cannot be disputed that "[t]his is a capital case, * * * and one moreover in which our reading of the evidence shows there is a real possibility that the wrong man is to be executed. In such a case, * * * [the defendant] should receive the benefit of the doubt." *Lindsay* v. *King, supra,* at 1043.

The judgment of the court of appeals in case No. 86-1548 is hereby affirmed, albeit for somewhat different reasons.

*Judgment accordingly.*

MOYER, C.J., SWEENEY, HOLMES, WRIGHT and H. BROWN, JJ., concur.

DOUGLAS, J., concurs in judgment only.