OPINION
Wyman Castleberry was tried by a jury and convicted in November 1991 of aggravated murder and aggravated robbery.[1]
The charges arose from the March 1990 shooting of Jose Soriano, resulting in his subsequent death from cardiorespiratory arrest several months later. The aggravated murder charge carried a death penalty specification, and both charges carried firearm specifications. Following the determination of guilt, the case proceeded to a mitigation hearing for the jury to recommend a penalty. The jury ultimately recommended the least severe punishment option, life imprisonment with no parole eligibility for twenty years. The trial court sentenced Mr. Castleberry in accord with the jury's recommendation, and added a mandatory three years' actual incarceration for the firearm specification.
In State v. Castleberry (Mar. 25, 1993), Franklin App. No. 92AP-336, unreported (1993 Opinions 974) ("Castleberry I"), this court affirmed Mr. Castleberry's conviction and sentence. In October 1993, the Supreme Court of Ohio declined jurisdiction.
In September 1996, Mr. Castleberry filed a petition in the trial court seeking post-conviction relief ("PCR"). Evidentiary hearings began in March 1997, and finally culminated one year later in March 1998. The trial court ultimately denied relief, dismissing the petition in January 1999.
Wyman Castleberry (hereinafter "appellant") has appealed the trial court's denial of his PCR petition, assigning three errors for our consideration:
First Assignment of Error
 The trial court erred in considering favorable suppressed evidence item-by-item instead of collectively in determining whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.
 Second Assignment of Error
 The trial court erred in finding that Castleberry's trial counsel provided effective assistance.
 Third Assignment of Error
 The trial court erred in finding that appellant had a fair trial where there were multiple instances of state[-]induced error, and the cumulative effect of such errors undermined one's confidence in the reliability of the conviction.
The assignments of error are interrelated and, therefore, will be addressed together. The first assignment of error contends, essentially, that the trial court erred in its piecemeal consideration of exculpatory evidence not disclosed to defense counsel prior to trial. This nondisclosure of evidence resulted in state-induced ineffective assistance of trial counsel, the claim of appellant's second assignment of error. The third assignment of error is substantively duplicative of the first, again arguing that the trial court erred in failing to consider the cumulative effect of the prosecution's evidentiary violations.
The record before us contains transcripts of the lengthy PCR hearings; the trial transcript is not included. Therefore, we glean the underlying facts adduced at the initial trial from, and necessarily cite liberally to, those set forth in Castleberry I. A fairly exhaustive summary is necessary in order to address the degree of potential significance of purportedly "undisclosed" evidence never presented to the jury.
On March 29, 1990, Officer Charles Miller of the Columbus Division of Police was dispatched to the homicide scene at 3417 Bexvie Avenue, Apartment C. He described the neighborhood as a "high crime area." He testified at trial that he discovered the victim, Jose Soriano, lying on the kitchen floor. Mr. Soriano had been shot and was unresponsive at the time Miller arrived. Castleberry I at 975. The officer testified that the victim's apartment complex, the Bexvie-Zettler Apartments, was located across the street from Jason's Bar. Miller explained that the bar and its parking lot were common "hang outs" in the area. People also liked to hang out at a grassy area near the apartments at 3419 Bexvie. Near this grassy area was a six-foot high brick wall behind units 3419, 3417, and 3415. Id., 976.
According to Miller, Daniel Watkins and James Johnson were at the scene, standing in front of Soriano's apartment. Watkins told the officer he was a family member of Soriano's. Both Watkins and Johnson told the officer they had not witnessed the shooting. Id.
Kenneth "Chief" Thomas testified for the prosecution. According to Thomas, he went to Jason's Bar at 8:00 p.m. on the evening of the shooting. Thomas went to the bar with his friend, Carl "Skeeter" Gamble. As Thomas was parking his car, he saw appellant, Doug Bailey, Tony Walker, Orlando Wilborn, Thomas Wilborn, and Lamont Martin standing outside near the bar. According to Thomas, he had known appellant for years as someone who lived in the neighborhood. Id.
After Thomas arrived, he claimed to have seen appellant walking across the street toward the back of the Bexvie-Zettler Apartments. According to Thomas, appellant had a small gun, "either a .32 or .38 revolver," in his hand. He then saw appellant put a leather jacket in a tree. As appellant was going through the back way of the complex, Thomas, Martin, Gamble and Thomas Wilborn went around to the front. Thomas testified that he was standing between units 3419 and 3417 when he saw appellant go to the back door of the victim's apartment. According to Thomas, he knew the victim from the victim's selling marijuana in the neighborhood. Id., 976-977.
Thomas testified that appellant knocked on the back door of the victim's apartment and asked for "a bag of weed." When the victim opened the door, appellant stepped in the apartment and, a "couple seconds" later, Thomas heard a gunshot. Thomas then saw appellant running out of the back of the apartment complex. According to Thomas, he and his friends fled the area immediately.Id., 977.
Thomas testified that he saw appellant the next day in the parking lot near Jason's Bar. According to Thomas, appellant said to him, "don't say nothing to nobody about what happened."Id.
Thomas first spoke to police about the incident while incarcerated at Orient Correctional Institution months after the shooting, where he was serving time for two counts of receiving stolen property. Thomas gave the following account of his crime, which involved property taken from apartments in Mr. Soriano's complex.
Thomas and an acquaintance, Marvin Hodge, were job-hunting one day when they met up with Dale Barney, who asked Thomas and Hodge if they wanted to buy some "stuff." Thomas indicated that they put the items in Hodge's car; they were soon pulled over by police. According to Thomas, Barney fled the scene, while Thomas and Hodge were arrested. The stolen items included a pair of tennis shoes, a television, a VCR and a stereo. Thomas testified that he learned later that the stolen property had come from Apartments A and B of the complex at 3417 Bexvie; however, Thomas denied that he had actually entered the apartments. Id., 977-978.
According to Thomas, he was interviewed about Mr. Soriano's death by a Detective Morris and another detective while Thomas was incarcerated at Orient. Thomas testified that he conveyed the same information to which he had testified. Thomas indicated that he had never contacted the police himself about the shooting. Thomas denied that he ever requested anything in exchange for the information he eventually provided to police.Id., 978.
On cross-examination, defense counsel questioned Thomas about his previous testimony during appellant's first trial in July 1991 (that subsequently declared a mistrial). In Castleberry,
the court described the following exchange during his cross-examination:
 * * * Thomas acknowledged that at that time he saw Danny Watkins standing outside the courtroom. Thomas was asked by defense counsel whether [he] had said to Watkins, "I don't know what good I can do, all I did was walk in and find him." [Tr. 150.] Thomas denied he had made such a statement; rather, Thomas testified, "that was what Mr. Watkins said to me." [Tr. 150.]
 Id.
Thomas's friend, Carl "Skeeter" Gamble, also testified for the prosecution. He testified that he had been with Thomas on the day of the shooting, and had been drinking. At 8:00 that evening, there were a lot of people hanging around Jason's Bar. According to Gamble, appellant was there and "was talking about robbing * * * the dope man, the dude that sells weed." Id., 979. Gamble testified that appellant had a gun. Gamble saw appellant take off a black jacket and hang it on a tree or wall. According to Gamble, he and some others were standing by the wall, drinking and talking, at that time. Gamble then described what happened next:
 WELL, HE STARTED WALKING UP THERE. SO, YOU KNOW, NATURALLY SINCE WE DIDN'T BELIEVE HIM, WE STARTED LOOKING, YOU KNOW. AND AS HE WALKED UP THERE, I GUESS HE KNOCKED ON THE DOOR CAUSE THE DOOR OPENED AND YOU SEE THE LIGHT FROM THE KITCHEN, AND THEN THE NEXT THING, YOU KNOW, THERE WAS A FIRE OFF. SO I RAN, YOU KNOW, OUT OF PANIC. * * *
 Id.
After fleeing the area, Gamble eventually returned to Jason's Bar. Gamble testified that appellant approached him and "was saying that the dude tried to grab the gun and he shot it and the gun went off." Id.
Detective Morris questioned Gamble about the shooting. According to Gamble, he did not initially tell the truth because, in essence, he did not want to get involved. However, when the detective told Gamble about what Kenneth "Chief" Thomas had said, Gamble eventually "told the truth" about what he had witnessed.
Thomas Bailey, who was also at Jason's Bar that evening, testified for the prosecution. Bailey saw appellant and some others in the parking lot near Jason's Bar. According to Bailey, when he arrived at the bar, appellant was wearing a black leather jacket. Bailey went into the bar to drink and play pool. When he was inside the bar, he heard a gunshot. He went outside, but he did not see anything. He went back into the bar. Approximately one hour later, he saw appellant in the bar. According to Bailey, appellant came over to him and said "the guy tried to take the gun from him and it went off." Id., 980.
Thomas Wilborn also testified on behalf of the state. He, too, was at Jason's Bar on the evening of the shooting. He testified that after getting a drink, he went across the street to the grassy area to join a group of about fifteen to twenty people. Wilborn was also smoking marijuana. According to Wilborn, appellant was there at the time, wearing a black jacket; appellant also had a gun.
Wilborn testified that he heard someone say something "about a weed spot," explaining to the jury that a "weed spot" was a "place where you buy marijuana." Id., 981. According to Wilborn, while he was still standing in the grassy area near the wall, he heard a gunshot. He testified that Kenneth "Chief" Thomas and Lamont Martin were near the opening of the wall at the time the gunshot was heard. Id., 981-982.
Lamont Martin, who was Thomas Wilborn's roommate at the time of the incident, was dropped off at Jason's Bar that night. Martin testified that when he arrived, he stood outside with Kenneth "Chief" Thomas, Carl "Skeeter" Gamble, Thomas Wilborn, and Doug Bailey. According to Martin, appellant was also standing outside with the people. Martin testified that he later observed appellant go behind the apartment building across the street from the bar. Martin, "Skeeter", "Chief" and Thomas walked to the front of 3419 Bexvie. According to Martin, he went over there "to see if he [defendant] was going to rob the dope man." Before Martin reached 3417 Bexvie, he heard a gunshot. When he heard the shot, he ran back to the bar. He did not see appellant after he heard the shot. Id., 982.
Dana Norman, a Columbus police officer assigned to the crime scene search unit, testified regarding his observations of the scene soon after the shooting. According to Norman, twenty-four baggies containing what appeared to be marijuana were found inside a stereo. Seven more baggies were found in a kitchen cupboard. The combined weight of the baggies' contents totaled 224.9 grams. Cash in the amount of $320 was found in a purse located around the neck of a stuffed animal.
David Morris, a homicide detective with the Columbus Police, testified that he and Detective Sharon Ceckitti were dispatched to the victim's apartment. Morris testified that he spoke with Danny Watkins and James Johnson at the scene. According to Morris, Watkins was very upset at the time.
Detective Morris went to the hospital where the victim was being treated. Because of the victim's condition, the detective was unable to interview him. The detective indicated that from the time of the shooting until the victim's death several months later, there were no significant leads in the case. He later interview the victim's parents, which ultimately led to his contacting Kenneth "Chief" Thomas and Carl "Skeeter" Gamble.Id., 983.
Detectives Morris and Ceckitti interviewed Thomas at Orient in September 1990. Morris testified that, "right off the bat he said Wyman Castleberry did it." According to Morris, Thomas "did not make any requests prior to the interview." However, Morris testified that he later received a request from Thomas's attorney to write a letter to a judge on Thomas's behalf. Morris acknowledged that he did so, and that Thomas was subsequently released from prison early. Morris stated that he wrote the letter on Thomas's behalf and he "was impressed by Kenneth Thomas." Id. 983; 993.
When Detective Morris interviewed Gamble, "there was an indication that Gamble was not telling the truth." After Gamble's "father made a comment to his son, * * * a new interview began." Morris testified that Gamble then provided him a statement regarding the shooting, although Castleberry I does not indicate the substance of that statement. Similarly, although Castleberry
notes that Morris testified he interviewed Thomas Wilborn and Lamont Martin, the opinion does not elaborate as to substance.
Detective Sharon Ceckitti testified regarding her interview with appellant, considered a "suspect" at the time, in September 1990. According to Ceckitti's testimony, appellant "denied having any knowledge of * * * the victim or where he lived or that he was dead or anything about him." Appellant also denied having any conversation with James Johnson about the incident.Id., 984.
Appellant's mother, Mattie Castleberry, testified at trial on her son's behalf. She testified that on July 10, 1991 (during the trial subsequently declared a mistrial), she was waiting outside the courtroom when she heard Kenneth "Chief" Thomas talking to someone in the hall. According to Ms. Castleberry, Thomas told the person, "I don't know what good I can do when all I did was walk in and find him." Id., 985.
James Correy, who resided at 3409 Bexvie, Apartment B, at the time of the shooting, also testified for the defense. On the night of the shooting, Correy went to answer a knock at his door; he heard gunshots. When he opened the door, he saw a man he identified only as "Albert." According to Correy, Albert pushed him back, and they saw two men running between the apartments. Id.
Kelly Kimball was working at Jason's Bar on the night of the shooting. According to Ms. Kimball, she could not remember whether she saw Kenneth "Chief" Thomas, Carl "Skeeter" Gamble, Doug Bailey, or appellant that night. She also could not remember hearing a gunshot that evening.
Orlando Wilborn testified that he and his brother Lamont, along with Kenneth "Chief" Thomas and Carl "Skeeter" Gamble, had been drinking at his (Orlando's) house on the evening of the shooting. Eventually, he and his brother went to Jason's Bar. According to Orlando Wilborn, Thomas and Gamble had left for the bar earlier. Wilborn testified that when he and his brother arrived at the bar, there were a number of individuals standing in the bar's parking lot and across the street in the grassy area. According to Wilborn, he was standing near the bar talking to James Johnson when he heard a single gunshot. After he heard the shot, he saw about ten people running toward the Pine Tree Apartments. Wilborn immediately went to his car, and his brother was already in the car. Wilborn testified that his brother Lamont stated to him, "those guys are crazy, they tried to rob the weed spot." Id., 985-986.
Appellant testified on his own behalf at trial. He testified that he did not know Jose Soriano, and he had never been to Soriano's apartment. Appellant stated that he never owned a firearm and that he did not have one in his possession on the night of the shooting.
According to appellant's trial testimony, he was in Jason's Bar having a drink and playing pool until just before the bar closed. Although he was out in the parking lot that night, he never went over to the grassy area across the street. He admitted that he had been smoking marijuana and drinking that night. He testified that he was wearing a gray cotton jacket that evening. Appellant denied that he went to the Bexvie Apartments that night and that he shot or tried to rob anyone that night. Id., 986.
The prosecution called Detective Morris back to testify on rebuttal. According to Morris, he did interview James Correy. Correy related that he was at his home at the time of the shooting and neither saw nor heard anything in the area of the incident that night.
Turning now to the evidence adduced at the hearings conducted on appellant's PCR petition, the following additional facts were revealed regarding the police investigation into Jose Soriano's death.[2]
During the course of canvassing the neighborhood and conducting interviews, Detective Morris interviewed Judy Thomas of 3413 Bexvie, Apartment B, located diagonally from Mr. Soriano's apartment. Ms. Thomas told the police that at approximately 8:15 on the evening of the shooting, she was watching television. When she heard two men arguing outside, she looked out her window and saw two thin black men, one of whom was "tall" and the other was somewhat shorter. This argument was taking place while the two men were standing on a front porch shared by Mr. Soriano's residence and a next door residence. According to Ms. Thomas, one of the two men said, "You mother-fucker, I'll kick your ass." The men stepped down to the sidewalk area and looked over at Ms. Thomas, who immediately closed her drapes. The police summary of this interview was not provided to defense counsel.
The police also interviewed Suntina Neddles, who resided at 3419 Bexvie, Apartment E, located just north of Mr. Soriano's apartment building. Ms. Neddles told police that she was looking at the parking lot area out of her upstairs window. She saw two male, black subjects exit a car which had been between two buildings. She believed that there were two other black males who stayed inside the car. Soon thereafter, she heard what she thought was the sound of a gunshot. She did not see the two men who had exited the car and walked between the buildings. However, she did see the two men who had stayed in the car (now parked in the lot) drive away from the area. The police summary of this interview was likewise never provided to defense counsel.
The police also interviewed Cerrie Clark, of 3407 Bexvie, Apartment A, located diagonally from the Soriano apartment. Ms. Clark told the police that between 8:00 and 8:30 p.m., she looked out of her front window, facing the parking lot. She saw three male, black subjects walking between the apartment buildings on the east side of the complex. Minutes later, she heard a car driving out of the parking lot at a high rate of speed.
Two days after Mr. Soriano was shot, Detectives Morris and Ceckitti interviewed the victim at the hospital. Mr. Soriano told the police that he did not know the identity of the person who shot him. The victim described the lone gunman as male, dark-black skin, who was 5'6" to 5'8", who had short hair and was clean-shaven. This information from the victim himself regarding the description of his assailant was never provided to defense counsel. There was testimony at the PCR hearing indicating that on the date of the shooting, appellant wore a goatee and, thus, was not "clean-shaven."
The police interviewed James Johnson again in September 1990. According to the statement he provided to police (after the detectives informed him what "Chief" had told them), Johnson told the detectives that he heard Kenneth "Chief" Thomas plotting the robbery of Soriano. This interview was never related to defense counsel.
After this interview with Johnson regarding "Chief's" involvement in plotting Soriano's robbery, the very following day, detectives interviewed "Chief" at the institution in which he was serving time for a conviction resulting from his possession of stolen property from the apartment complex in which the victim died.
Defense counsel and the jury never knew that Ms. Neddles saw two men go in or near the building where the victim was shot, and then saw a car leave immediately after she heard the shot. Defense counsel and the jury never knew that Ms. Clark could corroborate Ms. Neddles's recollections, including the physical description of the "thin" subjects they saw. The jury and defense did not know that "Chief" had allegedly conspired to rob Mr. Soriano. The jury and defense did not know the details of the victim's description of his assailant, particularly that he was clean-shaven; this was contrary to evidence presented by appellant that he wore a goatee at the time and did not have long hair.
Appellant's arguments, considered collectively, contend that the prosecution repeatedly violated the fundamental discovery rules enunciated by the United States Supreme Court in Brady v.Maryland (1962), 373 U.S. 83, and that the violations cumulatively resulted in a lack of due process. The basic premise of Brady, as expressly followed by the Supreme Court of Ohio in State v.Johnston (1988), 39 Ohio St.3d 48, paragraph four of the syllabus, is as follows:
 The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. (Brady v. Maryland [1962], 373 U.S. 83, followed.)
See, also, State v. Wickline (1990), 50 Ohio St.3d 114, 116, citing Brady, supra at 87; State v. Walden (1984), 19 Ohio App.3d 141,149.
In Johnston, supra, the Supreme Court of Ohio, at paragraph five of the syllabus, set forth the "materiality" standard:
 In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. This standard of materiality applies regardless of whether the evidence is specifically, generally or not at all requested by the defense. (United States v. Bagley [1984], 473 U.S. 667, followed.)
The standard by which we are bound in reviewing the trial court proceedings below is de novo. Thus, we need not affirm the trial court's findings of fact based on a requirement that deference be afforded a trial court's findings.
The process which this appellate court must follow is to evaluate the individual bits of information withheld to determine if the information was beneficial to the defense and material to the guilt or innocence such that the information should have been provided under the express requirements of Crim.R. 16 and Brady,supra. The first piece of information to be examined is the description of his assailant by the victim of the shooting, Jose Soriano. As noted above, the description was that of a male with dark-black skin, who stood 5'6" to 5'8" tall. Mr. Soriano also described his assailant as having short hair and no visible facial hair.
The exact description of Mr. Castleberry on the date of the shooting is not clear from the record. Written police records indicate that Mr. Castleberry is a male, black, height 5'10", weight 170 pounds. The records do not mention facial hair or length of other hair. However, a photograph of Wyman Castleberry taken three weeks after the shooting shows identification information of 5'9", 221 pounds, very dark complexion with a moustache. Informational summaries in the police file also indicate that Jose Soriano may have been attempting to mislead police as to whether or not he knew his assailant or assailants.
Under the circumstances, we cannot say that police or prosecuting attorneys knew that the description given by Jose Soriano was inaccurate or that it described someone other than Wyman Castleberry. Given Mr. Soriano's occupation as a drug dealer, Mr. Soriano may have had a motive to conceal what he knew about his assailant from police, either through distrust of the police or out of a desire to extract his own street justice at a later time. Further, the assistant prosecuting attorneys who conducted the first trial of Wyman Castleberry attempted to elicit testimony about the description given by Jose Soriano at trial. This attempt implies a belief that the description was incriminating of Mr. Castleberry. The failure to provide the description to defense counsel under the circumstances was not a violation of Crim.R. 16 or of Brady, supra.
The interview of Judy Thomas, who saw two men arguing on the front porch shared by Mr. Soriano's apartment and another apartment was even less pertinent to the issues a trial. The evidence at trial and the physical evidence from the shooting indicated that the shooting occurred inside the back door of the residence. No reason existed to believe that the argument had anything to do with the homicide, so the information was not discoverable under Crim.R. 16.
The other interviews also have no demonstrated ties to the shooting. The interviews do little other then demonstrate the presence of small groups of African-American males in the neighborhood where the shooting occurred. Suntina Neddles stated she saw two African-American males get out of a car and walk between two apartment buildings, possibly leaving other young men in the car. Cerrie Clark thought she saw three African-American males walk between two apartment buildings not far from Jose Soriano's apartment. Given the lack of any demonstrable tie to the homicide, the information did not need to be provided under the requirements of Crim.R. 16.
After a review of the information which was not provided, we find no error in the way in which the trial judge conducted the extended review of Mr. Castleberry's petition for PCR. Thus, the first and third assignments of error are overruled.
We also find no basis for an assertion that Mr. Castleberry was denied effective assistance of counsel. The second assignment of error is also overruled.
All three assignments of error having been overruled, the judgment of the trial court is affirmed.
Judgment affirmed.
DESHLER and PETREE, JJ., concur.
[1] For reasons not set forth in the record, appellant's original trial in July 1991 was declared a mistrial. The omission by the trial court of its reasons for declaring a mistrial was unsuccessfully challenged by appellant on direct appeal and is not an issue here.
[2] Upon appellant's motion, a visiting judge was assigned to preside over the PCR proceedings. An out-of-county judge was assigned because the petition alleged instances of prosecutorial misconduct on the part of the then-prosecutor of his trial, who was a magistrate of the same court at the time of the PCR proceedings, in which he was called as a witness.