{¶ 76} I respectfully dissent. For the following reasons, the trial court should have granted the motion for a new trial.
 {¶ 77} The majority's review of the file led it to the conclusion that nothing prejudicial had been withheld. While I agree that the sealed file seemed to be fairly complete, I disagree with the conclusion that appellant was not prejudiced.
 {¶ 78} The sealed file that this court received apparently contained all but four seemingly cumulative items sought by the defense. Arguably the withholding of those four items was not prejudicial. However, the sealed file did not clarify when many of the other items in the file were submitted to the defense. Further, as will be discussed, there are numerous references in the trial transcript which clearly indicate that several key items of discovery were submitted so late that it would have been impossible for defense counsel to assess their importance or to investigate further.
 {¶ 79} Pursuant to Crim.R. 16(E), the trial court had the authority to order a new trial based upon the state's failure to provide timely discovery. When the state withholds material, exculpatory evidence in a criminal proceeding, the state violates the defendant's due process right to a fair trial, regardless of the good faith or bad faith of the state.State v. Johnston (1988), 39 Ohio St.3d 48, 60. Exculpatory evidence is deemed to be material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." UnitedStates v. Bagley (1984), 473 U.S. 667, 682. The foregoing "reasonable probability" test applies to all cases where the defense alleges the prosecution improperly suppressed exculpatory evidence. Johnston at 61.
 {¶ 80} Thus, while the defense may have ultimately received all but these four items, certain material, exculpatory items were among voluminous stacks of files made available for viewing, but not copying, either immediately prior to the beginning of voir dire, during voir dire, or during the first week of trial.
 {¶ 81} Defense counsel for appellant were public defenders with all the usual time and expense issues faced by death qualified public defenders. Nevertheless, defense counsel did an outstanding job, as the trial judge first dismissed the aggravated arson charge and finally granted judgment notwithstanding the verdict by reducing the aggravated murder charge to murder.
 {¶ 82} However, the point remains that if the defense had been able to recognize and further pursue certain items which were not produced until immediately prior to trial and were buried in a mountain of late discovery, it is entirely possible that appellant may have been acquitted entirely. Therefore, appellant was prejudiced by the untimely submission of voluminous discovery evidence.
 {¶ 83} This prejudice is further magnified by the fact that there was a very viable alternative suspect in this case. He was apparently eliminated by virtue of two reasons, he claimed an alibi and, ultimately, the DNA evidence linked appellant to sexual conduct with the victim. Due to the untimely discovery, defense counsel had little to no opportunity to pursue the buried evidence that appeared to not only challenge, but to contradict this alternative suspect's alibi evidence as well as evidence of additional, but unidentifiable semen DNA.
{¶ 84} That being said, the record demonstrates that the court offered defense counsel a continuance at one point to allow for the examination of the felony records of the state's witnesses. Although defense counsel rejected this specific continuance, such refusal should not be viewed as a general waiver of objection to all of the late evidence.
{¶ 85} To further complicate this case, appellant had a record of other violent offenses. Subconsciously that reverberates, as even the majority felt it was relevant to include a footnote that appellant was simultaneously being prosecuted in connection with two other unrelated murders. Unfortunately, for our legal system to work, it has to work for the bad guys too.
{¶ 86} Returning to the specific issues addressed under the first assignment of error, the majority essentially holds that appellant has failed to demonstrate that the state committed a prejudicial discovery violation as all the discovery appeared to have been made before trial. As previously indicated, I respectfully disagree.
{¶ 87} While all discovery may have been provided, significant amounts were not made available until after voir dire had begun on October 13, 2000. The record reflects that opening statements were made on October 30, 2000. I quote from the trial court's entry denying the motion for a new trial to reinforce my belief that the state was prejudicially late in providing discovery:
{¶ 88} "This Court in attempting to ensure a fair trial to both the State of Ohio and the Defendant, Stanley Adams, has listened to Defendant constantly ask for the delivery of Rule 16 material that was parceled out beginning on October 8, again on October 9, on October 11, October 16, and October 29, 2000. This Court on at least one occasion had to order the State to make delivery of previously promised discovery.
{¶ 89} "Needless to say, one of the fundamental principles of a fair trial is to follow the rules of discovery promulgated by our legislature. * * *
{¶ 90} "* * *
{¶ 91} "* * * The appellate court upon review will correct any problem if it finds merit in Defendant's contentions."
{¶ 92} A specific example of one of the late submissions is a copy of a hospital report faxed to the prosecutor's office from the Hubbard Police Department on October 20, 2000. This report was part of the voluminous discovery turned over just prior to trial. The possibility is also raised that the prosecution was aware of this report well before the fax transmission date of October 20, 2000. There are time stamps on all pages of the report indicating that these copies were made on August 9, 1999, almost one year prior to their submission to defense counsel.
{¶ 93} In any event, the hospital report was significant in that it both challenged the credibility of one of the prosecution's chief witnesses and attacked the alibi of the other primary suspect. As previously indicated, appellant's primary defense was that Roslyn's ex-husband, David, was the real killer. The theory was that David, not appellant, had an ongoing, acrimonious relationship with Roslyn. They had engaged in a significant verbal argument, which culminated in pushing and shoving, at David's house on the actual night of the incident. In fact, due to David and Roslyn's volatile relationship, David was the initial suspect of the police.
{¶ 94} However, an occupant at David's house, Tracy Justice, testified that David sustained an injured hand from punching a door after his altercation with Roslyn. Further, she testified that David and another occupant, Fahim Evans, left for the hospital to seek treatment for David's hand within the period of time that Roslyn was assaulted and left for dead.
{¶ 95} Specifically, the jury heard Tracy testify that, at approximately 5:30 a.m., on August 5, 1999, David left his house with Fahim, allegedly to go to the hospital for treatment of David's hand She stated that Fahim and David returned to the house at 7:30 a.m. Tracy further testified that David had not received medical attention for his hand because the two hospital emergency rooms he allegedly visited were too busy to provide medical care.[2] According to the coroner, Roslyn's death occurred between approximately 6:00 a.m. and 6:30 p.m., on August 5, 1999.
{¶ 96} The previously mentioned hospital record indicated that David arrived at the hospital at approximately 11:30 a.m. It also indicated that David had informed hospital personnel that he had incurred the hand injury several days earlier.
{¶ 97} On the same day that this hospital report was turned over, defense counsel also received what appear to be statements from a police investigation. Apparently, a police officer was dispatched to David's house on August 6, 1999, for an open-burning complaint. The officer asked David about the cast on his right arm, and David stated, "Roslyn had shattered my arm a couple of days ago with a baseball bat."
{¶ 98} As previously indicated, defense counsel received the hospital report and the statements connected with the open-burning complaint as part of the voluminous discovery turned over just before trial. Thus, this information was apparently overlooked by defense counsel and was never made available to the jury to dispute Tracy's credibility and more importantly, David's alibi. Defense counsel could do little more than speculate to the jury that David was an equally viable suspect.
{¶ 99} The prejudice created by the untimely submission of both the hospital report and David's contradictory statements to police regarding the origin of his hand injury is compounded further by the late submission of the BCI report. It is not until the BCI representative, Cynthia Shannon ("Ms. Shannon"), testified that it became clear that BCI had received, but not analyzed, either the fingernail scrapings or the blood on Roslyn's ring. Ms. Shannon testified that the samples came with instructions, stating that an assault had occurred and to examine the samples for semen. She further testified that she was not informed there were defensive wounds on Roslyn's hands.
{¶ 100} In addition, when Charles Snyder ("Mr. Snyder") of BCI testified, he admitted that he inventoried Roslyn's car and did not send the key discovered in the car's ignition for fingerprints, despite the fact that the car was found in drive and the ignition was in the on position. This is important as the coroner indicated that it appeared the victim had been dumped in the car after she had been assaulted. Therefore, she probably was not the driver.
{¶ 101} Other evidence which the defense counsel did not receive in a timely manner was the evidence from BCI that either identified appellant as the donor of the sperm or discounted David as the sperm donor. This report was not received until two days before trial. Ultimately, the presence of appellant's DNA in the victim's anus became the critical evidence supporting appellant's conviction. It is worth nothing that only at trial, during the testimony of BCI representative Jennifer Duval, did defense counsel learn that the victim's anus contained two sperm samples, only one of which could be analyzed for identification purposes. The identifiable portion was linked to appellant. Again, defense counsel was unable to adequately address the issues raised by the untimely submission of discovery at trial.
{¶ 102} Moreover, apparently defense counsel never received a complete list of everything inventoried from the car in which Roslyn was found. Specifically, after the first witness had begun his testimony, the following sidebar took place:
{¶ 103} "* * * You're right you did give me what was sent to BCI, but I just got yesterday what was taken from the car. You did tell me what you sent BCI to check out, but * * * I only got this last night about everything else in the car. I should have been provided this * * *. And I should have been provided this [a] long time ago."
{¶ 104} From the relevant testimony, it is apparent that there were two inventory lists detailing items found in Roslyn's car and a separate list of items sent to BCI. The Trumbull County Sheriff's Department first inventoried the car and made a three-page list of its contents. Mr. Snyder of BCI also inventoried the car later that night. Mr. Snyder made a list and sent only selected items to BCI for analysis. During Mr. Snyder's testimony, defense counsel informed the court that they had received the list of the items that were sent to BCI, but did not receive a complete list of all the car's contents until the day before trial actually began.
{¶ 105} The transcript contains numerous instances of the difficulties encountered by defense counsel in evaluating the late discovery submissions, to wit:
{¶ 106} "It was either yesterday or this morning we received this packet of discovery and it talks about notes of Jeff Hoolihan, permission to search forms, there's three of them. A couple of BCI reports, lab reports, and three more detectives, a deputy, and Jason Emerine, who I believe is a nurse at the Trumbull City Jail. I appreciate that they did give it to you but we are in [the] second or third day of Jury selection, it really makes it difficult for us to respond to this * * *."
{¶ 107} Likewise, defense counsel indicated in reference to witness statements concerning what happened at David's house on the night of the party:
{¶ 108} "* * * I have read some of these statements. They are so voluminous, I haven't had the time * * * [t]o take a tape recorder and read them into a tape recorder. That would take me days to do that. I am saying that these one, two, three, four, five, six, seven, eight, nine, 10, 11, 12, 13 statements, that is not even half of the statements, and my co-counsel went over [to the prosecutor's office] and read some more, she told me about some more things she's found, is that these are riddled with exculpatory material. They point to somebody else * * *."
{¶ 109} The point is that even though these statements were ultimately provided, it was not until the trial had begun. As a result, defense counsel was unable to bolster their most significant defense; namely, that David was the perpetrator of this crime.
{¶ 110} Basically, the theory of the defense was that the sex between appellant and Roslyn was voluntary, and that she was killed by someone else shortly thereafter. There was no evidence of motive on appellant's part as there was testimony that Roslyn, while at David's house, had been loudly proclaiming how cute appellant was and that she might have sex with him. On the other hand, Roslyn had consistently antagonized and angered David throughout the evening, just prior to the incident. Additional testimony provided at trial established a history of physical violence between David and Roslyn.
{¶ 111} The physical evidence presented was also subject to viable alternative interpretations, as there was no direct evidence linking appellant to Roslyn's death. There was evidence of sexual activity with appellant, but the coroner admitted there was no physical evidence which indicated this was rape. The coroner found no evidence of trauma to her anus as might be expected during a rape. Upon direct examination, the coroner suggested that the victim might have been too intoxicated by drugs and alcohol to have resisted the rape. However, he failed to explain how that theory was consistent with the frontal defensive wounds, suggesting that Roslyn faced her attacker. More importantly, the coroner admitted that, except for the disarray of Roslyn's clothing, he had no evidence indicating that the beating took place at the same time as the sexual activity.
{¶ 112} The theory that the ex-husband, David, was an equally viable suspect became a non-issue when the defense was unable to challenge David's alibi testimony. Furthermore, the jury never heard about David's statement to the police that his arm was in a cast because Roslyn had hit him with a baseball bat. Thus, Tracy's credibility was not seriously attacked as to her additional assertion that David's hand was injured as a result of him punching a door following his argument with Roslyn.
{¶ 113} As a result, the prosecution could argue that David was unable to inflict the kind of beating later received by Roslyn. The buried hospital report indicates that David claimed the injury occurred several days before the incident, and the buried police investigation of the open-burning complaint also reveals that David stated Roslyn hit him with a baseball bat. These inconsistencies raise the question as to who lied and when. Did David lie to the hospital or to the police? Or, did Tracy lie about the injury to David's hand occurring on the night of the party?
{¶ 114} Either question would be significant in creating reasonable doubt created as to both David's alibi and the actual extent of injury to his hand as of 5:30 a.m. on the day of the assault. Although his hand was ultimately determined to be broken, there is no consistent, conclusive evidence as to when or how it was broken.
{¶ 115} Furthermore, if the state had provided complete discovery in a timely manner, defense counsel may have had a reason to investigate the possibility that David's friend, Fahim, was also involved. Testimony at trial revealed that on the evening of August 4, 1999, just prior to the murder, Roslyn had argued with Fahim about him residing at David's house. During the argument, Roslyn shouted racial epithets at Fahim and ordered him out of David's house. As previously indicated, David and Fahim left together for the hospital at about the estimated time of death.
{¶ 116} The quality of the state's evidence was not so overwhelming that one could conclude that the delay in discovery constituted harmless error. The assertion that appellant's conviction was supported by sufficient evidence is only true because of the various determinations of credibility made by the jury. Thus, if evidence had been available, which could have significantly impacted those credibility assessments, then the state's case against appellant was not so overwhelming to preclude a reasonable probability that the outcome of the trial would have been different.
{¶ 117} The state's case frankly rested on fragile ground. If all the late evidence had been admitted, the jury had to find that appellant raped and violently beat the victim, despite uncontested testimony that Roslyn indicated a desire to have sex with appellant. It would have to reconcile the contrary statements of Tracy and David as to when and how David's arm was injured. Further, it would have to believe Tracy's hearsay recollection that David and Fahim went to several hospitals prior to his 11:30 a.m. arrival and treatment at a local hospital. Moreover, the jury had to find that, notwithstanding evidence of extreme intoxication and valium use, Roslyn was alert enough to sustain frontal defensive wounds to her arms, but no trauma to her rectum. Finally, it would have to discount the presence of the additional unidentified semen.
{¶ 118} For the jury to rule out David, it had to ignore his history of physical violence with Roslyn and it had to believe David had an alibi during the time Roslyn was assaulted and left to die. In addition, the jury had to find that the sexual activity with appellant and the violent assault occurred at about the same time.
{¶ 119} Due to the untimely submission of discovery, defense counsel's ability to attack the credibility of the state's evidence was greatly hindered. If David's alibi and hand injury had been meaningfully challenged, the jury would have had to seriously consider him as an alternative suspect. Equally troubling was the state's failure to require BCI to analyze the key in the car ignition and the fingernail and ring scrapings. As mentioned previously, Ms. Shannon stated that she was instructed only to examine the evidence for semen and she stopped all further analysis once she linked appellant to the DNA.
{¶ 120} Based on the evidence which was before the jury, there was some evidence to support the jury verdict. Thus, the trial court's judgment should not be reversed on that particular basis. However because the state either deliberately or inexcusably delayed or failed to complete discovery of material, exculpatory items in a timely manner, the motion for a new trial should have been granted. By delaying complete and vital discovery in the underlying case, the state committed prejudicial error. This was a murder and rape conviction, not a parking ticket. Gamesmanship or incompetence of this magnitude by the prosecution should result in a reversal. Appellant's actual guilt or innocence is irrelevant to that conclusion.
{¶ 121} Pursuant to the foregoing discussion, I would conclude that appellant's first two assignments of error have merit. Accordingly, I would reverse appellant's conviction and remand this case for a new trial. To this end, I respectfully dissent from the majority opinion.
[2] Although Tracy's testimony on this point appears to be hearsay, defense counsel failed to present an objection.