The STATE of Ohio, Appellee,

v.

PHELPS, Appellant.

[Cite as *State v. Phelps*, 192 Ohio App.3d 484, 2011-Ohio-706.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 94683.

Decided Feb. 17, 2011.

William D. Mason, Cuyahoga County Prosecuting Attorney, and Matthew E. Meyer, Assistant Prosecuting Attorney, for appellee.

David L. Doughten, for appellant.

JAMES J. SWEENEY, Judge.

{¶ 1} Defendant-appellant Larry Phelps appeals the court's denial of his motion for a new trial. After reviewing the facts of the case and pertinent law, we affirm.

{¶ 2} On May 25, 1995, defendant was convicted of the murder, kidnapping, and robbery of Merle Johnston ("the victim"). Defendant was subsequently sentenced to life in prison. This court affirmed his convictions and sentence on appeal. *State v. Phelps* (Sept. 19, 1996), Cuyahoga App. No. 69157, 1996 WL 532092.

{¶ 3} In July 2009, defendant was granted leave to file a motion for a new trial based on the prosecutor's failure to divulge exculpatory evidence. After an evidentiary hearing, the court summarily denied defendant's motion on January 20, 2010, and defendant appeals, raising one assignment of error for our review:

{¶ 4} "I. The trial court erred by overruling the appellant's new trial motion."

{¶ 5} Specifically, defendant argues that the state's key witness in his 1995 trial, his ex-wife Laura, gave testimony that was tainted and inadmissible because she was hypnotized as part of the police investigation in this case, and the hypnosis was not disclosed by the state.

{¶ 6} Crim.R. 33(A) governs the grounds for granting a motion for a new trial, and it states as follows:

{¶ 7} "A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

{¶ 8} " * * *

{¶ 9} "(2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;

{¶ 10} " * * *

{¶ 11} "(6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial."

{¶ 12} The Ohio Supreme Court held in *State v. Johnston* that although testimony by a witness under hypnosis is inadmissible per se, posthypnotic testimony may be admissible under certain circumstances. *State v. Johnston* (1988), 39 Ohio St.3d 48, 50–54, 529 N.E.2d 898. First, "testimony of a witness who has undergone hypnosis is admissible if it relates to matters recalled prior to hypnosis, so long as its independence is reliably shown." Id. at 50–51. Second, "hypnotically refreshed testimony * * * is admissible only if the trial court

determines that, under the totality of the circumstances, the proposed testimony is sufficiently reliable to merit admission." Id. at 54.

{¶ 13} In the instant case, defendant alleges that Laura's hypnosis was procured by the prosecutor and homicide detective assigned to this case, but the state failed to provide this information to defendant prior to trial. Defendant further argues that Laura's testimony was inadmissible because it did not meet the reliability standards set forth in *Johnston*. According to defendant, allowing Laura's inadmissible testimony was materially prejudicial to him because without it, the evidence was insufficient to support his convictions.

{¶ 14} A brief history of the facts leading to defendant's 1995 trial and convictions follows.

{¶ 15} In 1985, Laura was working as a prostitute, and defendant was her pimp. When Laura went home after working the streets on the night of August 26, 1985, defendant and another man were in her living room. She recognized this other man because he had solicited her for sex earlier that night. She saw defendant punch the man in the face, knocking him down. The next morning, Laura saw this same man leaning against a pole in her basement. She later saw defendant put the man in a bear hug and walk him upstairs. There was a plastic garbage bag over the man's head. Defendant told Laura to get in the car because they had to go for a ride. They drove for hours on the freeway, toward Pennsylvania or New York, stayed overnight, and came back the next morning. Laura was sleeping or passed out drunk in the car for most of the trip. However, she remembered that at one point, she woke up to find the car pulled over to the side of the road and defendant standing outside near the car.

{¶ 16} Three weeks later, Laura was pulled over by the Cleveland police. She was driving a car that belonged to the victim, who had been missing since August 26, 1985. The police questioned Laura and defendant about this vehicle. Defendant explained that he occasionally worked as a repo man and had recently repossessed this car as collateral for a debt. Apparently, this did not lead to any further information in the investigation.

{¶ 17} In February 1988, Laura came into contact with the Cleveland police again. Detective Ernest Hayes interviewed Laura as part of an investigation of the December 1987 death of two males. Defendant was a suspect in this investigation. During the interview, Laura also agreed to talk about the events that occurred on August 26–27, 1985, in an effort to keep defendant away from her. Defendant had been physically abusing Laura for years, and he had recently severely beaten her. Hayes wrote a report on February 16, 1988, summarizing what Laura said had happened in August 1985:

{¶ 18} "Once inside, [the victim] met [defendant], who struck him in the face, knocking him down. [The victim's] bank card was taken from him, LAURA took this to the bank and it was rejected as not authorized. When she returned to the home * * * [defendant] had taken the victim into the basement and he was handcuffed to a pole. [Defendant] was looking through [the victim's] brief case, [sic] there was [sic] a lot of papers from business deals. She said that one of the names on the papers was JOHNSON. It should be noted that the missing person is named MERLE LEE JOHNSON.[1] * * * [Defendant] and Laura went to their basement, the victim was stood up and then [defendant] punched him in the chest. He then held the victim around the kneck [sic] with his arms. The male fell to the floor and did not move. A bag was placed over his head, [sic] this was plastic. He [sic] lower body was wrapped with something like a blanket. [Defendant] carried his [sic] up the stairs and placed him in the back trunk of his car. She said that was the same car that he drove to [her house] and that she was arrest[ed] in and it was towed. After the victim was placed in the trunk later they started to drive with [defendant] being high on drugs (Cocaine). While they were driving she smoked marijuana and drank some whiskey. She said that she is not a drinker and she became very high from the two things. They went to PENN. And NEW YORK. They drove through both states. She said someplace they stopped along side the road and [defendant] picked the body out of the trunk and throwed [sic] it into a wooded area. She thought this was a rural area. * * * There was no doubt in her mind that the male was dead."

{¶ 19} The next day, February 17, 1988, authorities in Pennsylvania and New York were notified to report any unidentified bodies to the Cleveland Homicide Unit.

{¶ 20} On February 21, 1988, Hayes wrote a second report after speaking with Laura again. According to this report, Laura "told me that after she got home after she talked to us that she went to the basement and tried to recall what she saw. She then told me that she could not remember anything that she thought happened. She said that she was sorry that she started this story. She said that she feels that she was given the information by [defendant] to keep her in line. * * * I then mentioned that I would like her to be hypnotized to see if her memory could be brought back to that day in question. She said that she though[t] this would be a good idea. She then added that at the time she was using a lot of marijuana and thinks she may have been under the influence at the time this happened."

{¶ 21} Laura told Hayes that she had recently spoken with defendant twice on the phone. Defendant was in jail at the time on other charges. Hayes's

---

1. The victim's last name was Johnston, not Johnson.

February 21, 1988 report states that "it would appear" that Laura's conversations with defendant were "used to bolster her up and have her back up on the oral statement" she made to police on February 16, 1988.

{¶ 22} On April 30, 1988, Hayes authored a third report in the victim's missing-person case. Hayes, Cleveland Police Sergeant John Fransen, and Cuyahoga County Prosecutor Ed Walsh discussed hypnotizing Laura because "she has attempted to recall the events that occured [sic] on the day and day after the victim[']s disappearance, this she was unable to do [sic]." Walsh suggested that Robert Kahl conduct the hypnosis. Kahl "was given the reports of the investigation which he read." Kahl told Hayes that he could hypnotize Laura, although he could not guarantee any results.

{¶ 23} According to the April 30, 1988 report, Hayes explained to Laura that the hypnosis would require three consecutive sessions, and arrangements were made to go forward on May 10–12, 1988. There is no further evidence about hypnosis in the record until 21 years later, when defendant filed this motion for a new trial.

{¶ 24} In November 1988, human skeletal remains were found ten yards from a highway in a rural area near Erie, Pennsylvania. A gray plastic bag was wrapped around the skull. The Erie County Coroner determined that the skull, jaw, sternum, and rib bones were severely fractured, indicating the possibility of fatal damage to the brain, spinal cord, heart, and/or lungs.

{¶ 25} On March 2, 1993, through dental records, the remains were identified as the victim's.

{¶ 26} On March 23, 1993, Laura gave another statement to the Cleveland police regarding the events of August 26–27, 1985. Laura had a lawyer with her and signed the statement. This was the first time she put anything in writing regarding this case. However, this written statement is not part of the record on appeal.

{¶ 27} On June 2, 1993, defendant was charged with the murder, kidnapping, and robbery of the victim. In exchange for testifying against defendant, Laura was given immunity, and the state dismissed the death-penalty specification against defendant.

{¶ 28} On May 8, 1995, Laura testified to the following at defendant's trial: When she came home on the night of August 26 or the early morning of August 27, 1985, defendant and another man were in the house. Defendant, who "knows karate," hit this man in the face, and the man went down. The next morning, the man was leaning on a pole in her basement. Laura asked defendant about the man, and defendant replied, "Stay out of the basement." Defendant told Laura that they were going to give this man a ride and drop him off. She saw

defendant put his arms around this man, "urging him towards the steps." A garbage bag was put over the man's head because defendant "didn't want the person to see where he was going, where he was getting dropped off."

{¶ 29} Defendant and Laura got in the car. Defendant told Laura they were going to Cincinnati. Laura testified that other than making occasional stops, she did not "really have [a] good recollection of the drive." Laura testified that she does not remember where they went, but they did not go to Cincinnati. She thought they drove for approximately eight hours and arrived back home the next morning. She never saw the man with the bag over his head again.

{¶ 30} Asked why she chose to reveal information about the August 1985 events to the authorities in February 1988, Laura testified as follows: "I lied about some of the circumstances, I was trying to get in the Witness Protection Program and be relocated out of state." Laura testified that in 1988, nobody believed her.

{¶ 31} Laura also testified that she did not tell "the entire truth" in her March 23, 1993 written statement, because she was "scared to death" that she would be charged. According to Laura, there was a "skeleton" of accuracy in her 1993 statement. Laura testified that she did not remember what the man in the basement looked like, and there was confusion as to whether he was the same man who had solicited her for sex earlier that night. Laura testified that she has lied to the police before to "get even with" defendant and to keep him away after he abused her. Laura also testified that she had prior convictions for forgery, uttering, and prostitution.

{¶ 32} On May 25, 1995, based on Laura's testimony, defendant was found guilty of murdering, kidnapping, and robbing the victim, and he was sentenced to life in prison.

{¶ 33} In March 2009, defendant requested leave to file a motion for a new trial, which was supported by two affidavits signed by Laura. One was dated June 2, 2007, and it stated that in May 1988, she underwent hypnosis as part of the Cleveland Police Department's investigation of the victim's 1985 disappearance "in order to assist memory recall of events." Laura alleged that she was hypnotized twice by Robert Kahl, and both sessions were videotaped. Laura claimed that "while under hypnosis, I had recalled traveling to Pennsylvania, a fact for which I had no independent recollection." Laura additionally alleged that she was instructed by the prosecutor and Hayes "not to disclose to anyone that I had been placed under hypnosis."

{¶ 34} Laura signed the second affidavit on February 21, 2009, and it went into more detail about the hypnosis. However, in this affidavit, Laura claimed that "[a]fter the testing was completed, I was told that a breakthrough had not

occurred." She also stated as follows: "I do not know the full effect of the hypnosis. I do remember testifying to matters that I did not have an independent memory of occurring. I cannot remember now which I did remember apart from the hypnosis."

{¶ 35} The court granted defendant leave, and on December 14, 2009, the court held a hearing on defendant's motion for a new trial. Hayes, who retired from the Cleveland Police Department in 1989, testified at this hearing. Hayes agreed that he and Prosecutor Walsh arranged for Cleveland Police Officer Robert Kahl to hypnotize Laura in May 1988 in relation to this case. Hayes testified that he was present at one session, but because it occurred some time ago, he remembered very little about the hypnosis. Hayes recalled that the session was extremely short and that Laura "just said she didn't feel good and that was the end of it." According to Hayes, there were no subsequent sessions.

{¶ 36} Asked whether this hypnosis was an important step in the investigation, Hayes testified: "This was a total waste of time and I found out nothing."

{¶ 37} No record exists of Laura being hypnotized. Former prosecutor Walsh and defendant's two trial attorneys are deceased. Kahl is thought to be living in Scotland, but was not located to testify. Although Laura provided two affidavits to trigger defendant's motion for a new trial, she exercised her Fifth Amendment right to not testify at the hearing. Therefore, there is no evidence in the record of the effect the hypnosis had on her recollection of the incident.

{¶ 38} Nonetheless, we must determine whether Laura's testimony was "hypnotically enhanced" under the guidelines in *State v. Johnston,* 39 Ohio St.3d 48, 529 N.E.2d 898. It is not alleged that Laura was hypnotized on the witness stand during the 1995 trial; thus her testimony is not inadmissible per se. However, she was hypnotized after the date of the offense and prior to testifying. Under *Johnston,* if her testimony was independent of the hypnosis, to be admissible, it must be determined that her proposed testimony was consistent with her prehypnosis memory of the events. *Johnston* at 50–51. "[W]hen the previously hypnotized witness testifies to facts recalled prior to any hypnosis," admissibility may be determined without a hearing. *State v. Cook* (1992), 65 Ohio St.3d 516, 520, 605 N.E.2d 70.

{¶ 39} If, however, Laura's testimony was refreshed by, or dependent on, the hypnosis, the reliability of the proposed testimony becomes the focus, and the "court should make this determination in a pretrial hearing." Id. *Johnston* set forth six guidelines that courts may consider in determining whether the testimony should be admitted:

{¶ 40} "(a) The hypnosis session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis, to ensure the most accurate recall possible.

{¶ 41} "(b) The qualified professional conducting the hypnosis session should be independent from any of the parties in the case, to avoid any biased procedures or questions.

{¶ 42} "(c) Any information given to the hypnotist by any of the parties to the case prior to the hypnosis session should be recorded, at a minimum in writing, so that the trial court can determine the extent to which the subject may have received any information from the hypnotist.

{¶ 43} "(d) Before the hypnosis session, the hypnotist should obtain a description of the facts from the subject, avoiding adding new elements to the subject's description, so that the trial court can compare the subject's pre- and post-hypnotic recollection.

{¶ 44} "(e) The hypnosis session and all other contact between the hypnotist and the subject should be recorded, preferably on video tape, so that a permanent record is available to reveal the presence of any suggestive procedures or questions.

{¶ 45} "(f) Generally, only the hypnotist and the subject should be present during the hypnosis session, in order to protect against inadvertent influence. However, other persons may be present if their attendance is necessary and steps are taken to prevent their influencing the results of the session." *Johnston,* 39 Ohio St.3d at 55, 529 N.E.2d 898.

{¶ 46} Defendant argues that Laura was hypnotized to refresh her memory. Hayes's February 21, 1988 report supports this, because Laura essentially recanted the statement she had made to police six days earlier, which implicated defendant in the victim's murder, and claimed instead that she could not remember anything that happened.

{¶ 47} However, in the February 16, 1988 report, Laura recalled specific details about the events of August 26–27, 1985, many of which are corroborated by other evidence. For example, she remembered being arrested in October 1985 driving the victim's car. The victim's bank-card statement showed a dishonored check for $350 made out to "Larry Phelps." Laura recalled defendant hitting the victim in the face or head and "bear hugging" him around the chest and neck, which is consistent with fractures found on the victim's skull, jaw, sternum, and ribs. In the statement, Laura remembered a plastic bag being placed over the victim's head, defendant putting the victim in the trunk of the car, and driving to Pennsylvania and New York. Three years later, the victim's

skeletal remains were found in Pennsylvania, and there was a plastic garbage bag over the skull.

{¶ 48} Laura testified against defendant in 1995—ten years after the events in question and seven years after being hypnotized—and her memory of the 1985 events was rather vague. In fact, the best recollection she had of the events was before she was hypnotized. Nothing in the record suggests that the hypnosis refreshed her memory.

{¶ 49} Defendant also argues that although there may not have been "new memories," as a result of the hypnosis, "previous inaccurate statements may now be seen by the witness as a 'memory.'" While this argument is novel, it is speculative because no record exists of Laura's hypnosis. In *Brady v. Maryland* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215, the United States Supreme Court held that if the state fails to disclose materially exculpatory evidence, a due-process violation occurs "irrespective of the good faith or bad faith of the prosecution." On the other hand, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood* (1988), 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281.

{¶ 50} In the instant case, there was no *Brady* violation because a memorialization of Laura's hypnosis—say, a videotape for example—would not have established defendant's guilt or innocence. Rather, a video of Laura's hypnosis may have been taken into consideration to determine whether her testimony was admissible. This is akin to "potentially useful" evidence, "'of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'" *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, ¶ 9, quoting *Youngblood* at 57.

{¶ 51} While we agree with defendant that Laura's hypnosis is "newly discovered evidence," in our opinion, her testimony was admissible; therefore, defendant was not materially prejudiced. See *State v. Cook* (1992), 65 Ohio St.3d 516, 520, 605 N.E.2d 70 (holding that the court need not hold a hearing to determine that testimony from a previously hypnotized witness was admissible when "it is not shown [that] hypnosis has elicited any additional information of consequence"). Furthermore, the state's failure to record or disclose the hypnosis did not violate defendant's due-process rights because he did not meet his burden of showing a conscious wrongdoing or bad faith on the part of the state. See *State v. Pawloski*, 188 Ohio App.3d 267, 2010-Ohio-3504, 935 N.E.2d 111.

{¶ 52} Accordingly, the court did not err in denying defendant's motion for a new trial, and his sole assignment of error is overruled.

Judgment affirmed.

CELEBREZZE JR., P.J., and GALLAGHER, J., concur.

