[Cite as *State v. Phelps*, 2016-Ohio-2631.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103206**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## LARRY PHELPS

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-93-296956-A

**BEFORE:**   Stewart, P.J., S. Gallagher, J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:**   April 21, 2016

**ATTORNEYS FOR APPELLANT**

Kort Gatterdam
Erik P. Henry
Carpenter, Lipps & Leland, L.L.P.
280 North High Street, Suite 1300
Columbus, OH 43215


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

Daniel T. Van
Assistant County Prosecutor
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, OH 44113

MELODY J. STEWART, P.J.:

{¶1} Defendant-appellant Larry Phelps appeals the denial of his second motion for a new trial. On appeal, Phelps argues that the court improperly denied his motion without a hearing. We disagree and affirm.

{¶2} On November 17, 1988, a hiker walking through the woods near Erie, Pennsylvania, found the partially buried skeletal remains of an unidentified male. The remains were found approximately ten yards down a steep embankment off of Interstate 90. The body was bound at the ankles with wire and a leather belt was entwined through the legs. The body also had a plastic bag clinging to portions of the skull. The county coroner recorded the death as a homicide. Forensic analysis and dental records later revealed that the body belonged to Merle Lee Johnston, a northeast Ohio resident, who went missing in August 1985.

{¶3} In 1992, the Cuyahoga County Grand Jury indicted Phelps on charges of aggravated murder with a felony-murder specification, aggravated robbery, and kidnapping, in connection with Johnston's disappearance and homicide. At trial, the state presented the testimony of Laura Phelps, who was married to Phelps at the time of Johnston's disappearance in August 1985.

{¶4} In exchange for immunity, Laura testified that at the time of Johnston's death she was living with Phelps and worked as a prostitute. Phelps would act as her pimp and would sometimes also work as a "repo" man. While working on the night of August 26,

1985, Laura was approached by a man in a blue car who requested an act of bondage. She declined the advances and carried on with her night. When she arrived home, she noticed the blue car on the street in front of her house. She entered her home and proceeded upstairs to bathe and smoke marijuana. Afterwards, she went downstairs and the man who had solicited her was in the living room with Phelps. She testified that she witnessed Phelps hit the man in the shoulder or face causing the man to fall over.

{¶5} The next day, when Laura returned home from her children's school, she saw the same man sitting on the basement floor leaning against a pole. Laura testified that after she saw the man, Phelps told her not to go into the basement anymore. Later that night, Laura went down to the basement and witnessed Phelps order the man to place a plastic bag over his head. According to Laura, Phelps told her that he did not want the man to see where he was going. Phelps told Laura that they were going to give the man a ride. She then observed Phelps give the man a "bear hug." This upset Laura so she went upstairs. She did not recall how much time passed, but eventually Phelps "told [her] to get into the car it was time to go." She testified that Phelps told her that they were going to Cincinnati to visit his mother, but admitted that they never went to Cincinnati. Laura testified that she was high and drunk and could not say where they went, but she did remember that they drove on the freeway. Laura testified that she passed out in the car and woke up when the car stopped. She did not know where they were when they stopped but "[Phelps] was outside [of] the car."

**{¶6}** A few weeks later, a Cleveland police officer stopped Laura in Johnston's car. Phelps, who was with Laura at the time, explained to the police officer when asked why they were driving a missing man's vehicle, that he had recently repossessed the vehicle at the request of a "white man." The officer allowed the two to go and wrote up a police report. The car was later towed from the parking lot of MetroHealth Hospital where Laura had parked while at the hospital.

**{¶7}** A jury found Phelps guilty of all three charges. The court sentenced him to a term of life imprisonment on the aggravated murder count, consecutive to lesser prison terms on the aggravated robbery and kidnapping counts. Phelps directly appealed his convictions, which were upheld by this court in *State v. Phelps*, 8th Dist. Cuyahoga No. 69157, 1996 Ohio App. LEXIS 4067 (Sept. 19, 1996). The Ohio Supreme Court declined review. *State v. Phelps*, 78 Ohio St.3d 1515, 679 N.E.2d 310 (1997).

**{¶8}** In 2009, Phelps filed a motion requesting leave to file a motion for a new trial. The basis for the new trial motion was the newly discovered evidence that Laura had been hypnotized prior to trial, a fact that was undisclosed to the defense. Following an evidentiary hearing in which Laura invoked her Fifth Amendment right not to incriminate herself, the trial court summarily denied the motion. This court affirmed the trial court's decision on the basis that the hypnosis did not appear to produce any information that was not already disclosed to police prior to the hypnosis sessions. *State v. Phelps*, 192 Ohio App.3d 484, 2011-Ohio-706, 949 N.E.2d 567, ¶ 38 (8th Dist.) (citing *State v. Johnston*, 39 Ohio St.3d 48, 50-51, 529 N.E.2d 898 (1988), for the proposition

that testimony is admissible following hypnosis if it is determined that the testimony is consistent with pre-hypnosis memory of events). Although the court acknowledged that Laura's hypnosis was newly discovered evidence, it concluded based on *Johnston,* that her testimony would have been admissible at trial and therefore Phelps was not materially prejudiced by the state's failure to disclose. *Phelps* at ¶ 51.

{¶9} The pre-hypnosis information that the court referred to in *Phelps, supra*, was contained in a police report written by Detective Ernest Hayes, of the Cleveland police department. In the report, Detective Hayes transcribed an interview he had with Laura in February 1988 soon after an incident of domestic abuse where Phelps left Laura severely beaten and seeking refuge at a women's shelter. During the interview, Laura told Hayes a version of the story surrounding Johnston's disappearance and death — notably, the interview occurred ten months before Johnston's body was discovered.

{¶10} Laura told Hayes that she came into possession of the blue Cutless Supreme because her husband killed the owner. According to the police report, Laura explained that she was working the area of East 40th Street and Prospect Avenue when a male stopped her while in his vehicle and asked to have sex with her. The man told Laura that he did not have money to pay her but that he did have some credit cards. They tried to use some of the credit cards, but they were declined. Not knowing what to do, she called Phelps who told her to bring the man and his car back to their home. Once they arrived at the home, Phelps hit the man in his face, knocking him down. Phelps took the man to the basement and handcuffed him to a pole. According to Laura, Phelps rummaged

through the man's briefcase and found papers inside the briefcase with the name "Merle Lee Johnson"[1] written on them.

{¶11} Laura explained to the detective that the man remained in her basement until the afternoon when she told Phelps that she wanted the man out of the house before the kids came home from school. Phelps and Laura went to the basement and Phelps stood the man up and punched him in the chest. According to Laura, Phelps held the victim around the neck with his arms until the man fell to the floor and did not move. A plastic bag was placed over his head and his lower body was wrapped in a blanket. Phelps carried him up the stairs and placed the body in the man's car. Thereafter, Laura and Phelps drove to Pennsylvania and New York, with the body in the trunk of the car. Laura confessed that they were both high on drugs at the time.

{¶12} Laura stated that at some point they stopped along the side of the road and Phelps took the body out of the trunk and disposed of it in a rural, wooded area. They threw the man's briefcase, papers, shoes and glasses out of the car at another location and returned to Cleveland. There was no doubt in her mind that the man was dead when they dumped his body. As a result of this information, Hayes sent alerts to police departments in Pennsylvania and New York requesting that any unidentified body be reported to the Cleveland homicide unit.

{¶13} Two days after the interview, Laura called Hayes to recant. After speaking to Laura again, Hayes wrote a second report in which he explained that Laura told him

---

[1] In the police report, the victim's last name is spelled "Johnson," not "Johnston."

that after speaking with him initially, she went into her basement and realized that she could not recall anything that she thought had happened. She said that she was sorry that she started the story and that she thought "that she was given the information by [Phelps] to keep her in line." Hayes wrote in the police report that he asked Laura if she was willing to be hypnotized to see if her memory could be brought back to the day in question. The police report indicated that Laura agreed to try hypnosis.

{¶14} On April 30, 1988, Hayes authored a third report. The report explains how he and police sergeant John Fransen, and Cuyahoga County Prosecutor Ed Walsh discussed hypnotizing Laura. According to the report, Walsh suggested that police officer Robert Kahl conduct the hypnosis after reviewing reports of the missing person investigation. Kahl agreed to do the hypnosis but told Hayes that he could not guarantee any results. According to the April 30 report, arrangements were made to go forward with the hypnosis on May 10-12, 1988. The record is devoid of any evidence of the hypnosis until 21 years later when Phelps filed his first motion for a new trial after discovering that Laura had been hypnotized prior to trial.

{¶15} On October 30, 2014, Phelps filed a motion for leave to file a second motion for a new trial. In it, he argued that he should be given a new trial because: 1) Laura has no independent memory of the facts she testified to and believes that her testimony was the result of hypnosis, 2) Officer Robert Kahl was in fact an experienced hypnotist that "knew what he was doing" even though he was not a licensed psychiatrist or psychologist, and 3) the affidavit of a Leonard Aiken, Jr., reveals that another man,

Gregory Lockett, killed Johnston. The court granted the motion for leave to file on the basis that at least Aiken's affidavit presented new evidence and indicated that it would proceed to rule on the merits of the motion. After reviewing the documents, the court denied the motion without a hearing. In its order denying the motion, the court stated that the hypnosis sessions were not new evidence because the entire issue was previously considered in the 2009 motion for a new trial, and it explained that it found Aiken's affidavit incredible and contradictory to other police reports in evidence. Phelps appeals this denial.

{¶16} Phelps submitted his second motion for a new trial under Crim.R. 33(A)(6). The rule allows a trial court to grant a new trial "[w]hen new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial." A Crim.R. 33(A)(6) motion for a new trial on the basis of newly discovered evidence may be granted only if that evidence:

> (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.

*State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus. By its terms, the rule does not require an evidentiary hearing on the motion. *State v. Connor*, 8th Dist. Cuyahoga No. 103092, 2016-Ohio-301, ¶ 23. Therefore, the decision whether to hold an evidentiary hearing is committed to the sound discretion of the trial court and will be

upheld absent an abuse of discretion. *Id.* Likewise, the decision whether to grant the motion for a new trial lies within the sound discretion of the trial court. *Id.*

{¶17} We cannot conclude that the trial court abused its discretion when it denied the motion without a hearing. To begin, as the trial court noted, Laura's hypnosis is not new evidence. The hypnosis issue was previously addressed in Phelps's first motion for a new trial and the denial of that motion was upheld on appeal, in large part, because of Laura's February 1988 interview with Detective Hayes where she described the circumstances surrounding Johnston's murder in great detail prior to the hypnosis sessions. Phelps maintains that there is new evidence on this issue because Laura was unsure about what effect the hypnosis sessions had on her memory at the time of the first motion for a new trial and that it is only through ongoing counseling that she was able to discover that she had no independent memory of Johnston's disappearance. We are not convinced. This alleged new evidence does not explain how Laura gave a detailed description of the murder and disposal of the body to Detective Hayes in February 1988. Facts elicited in Laura's initial interview, which were substantially similar to facts uncovered at trial, include the fact that the body was discovered in a wooded, remote location near the New York/Pennslyvania border, that the head of the body was covered by a plastic bag, and that the body was wrapped in a tarp.

{¶18} Further, as expert testimony at trial revealed, Johnston's skeleton had several broken bones that were consistent with blows to the head and pressure to the neck and abdomen — supporting Laura's testimony that Phelps hit Johnston in the face and

bear hugged him. Lastly, the contention that the hypnotist, Detective Kahl, might have been experienced at hypnosis and able to effectuate results (a heavily debated fact during the first motion for a new trial), does not explain how Laura's most detailed description of the murder occurred prior to hypnosis.

{¶19} We also conclude that the court committed no abuse of discretion when it determined, without a hearing, that the Aiken affidavit was insufficient to warrant a new trial. In May 2012, Aiken, who has a felony conviction for murder, executed an affidavit averring that another man, Gregory Lockett, likely killed the man who was found in November 1988 off of Interstate 90. Aiken avers that in August 1990, he was interviewed by Erie County police detectives about the murder of a local woman, Dorothy Stovall, whose body was found shot and wrapped in a carpet underneath an Erie County bridge. The point of the interview was to investigate the homicide of the body found in Erie County off of Interstate 90 (the body later identified as Johnston) and to determine whether the woman's murder and the Johnston murder were somehow connected. Although Lockett was tried and convicted of murdering Stovall, police thought Aiken might have information regarding the woman's murder and the newly discovered body after Lockett told police officers that he was wrongly convicted and that Aiken was the true killer.

{¶20} In his affidavit, Aiken states that he remembers Lockett confessing to him that he murdered a black female[2] and a white male. According to Aiken, Lockett told

---

[2] Although Aiken does not explicitly say that the black woman he is referring to in his

him that he was buying weed from the white male when the male pulled a knife on him in an attempt to rob him. Lockett allegedly told Aiken that he shot the man with a ".25 automatic." Lockett also shot the black female when she tried to run. According to the affidavit, Lockett advised Aiken that after the killings he wrapped the woman's body in a carpet and dumped her under the Franklin Terrace Bridge in Erie, Pennsylvania. Aiken further averred that Lockett told him that he drove the white male near the grape farms in Harborcreek, used a belt to tie the dead man up and drag his body, and then proceeded to place the man against a tree where he used a shotgun to fire shots into the man's head and chest, so that he could not be identified by dental records. Aiken states Lockett told him that he placed a green or black garbage bag over the man's head so that blood would not splatter and showed Aiken the blood stains on the front and back seats of his car.

{¶21} While Aiken's affidavit paints a harrowing picture of a possible murder, we must conclude that if a man was murdered the same day as Stovall, then that man could not have been Johnston. Our determination on this point is informed by a police report attached to Phelps's motion for leave. The police report states that the police discovered Stovall's body on February 11, 1985. According to a missing persons report filed by Johnston's mother on August 28, 1985, Johnston was last heard from on the evening of August 26, 1985, when he called his mother to let her know that he was at dinner and

_____

affidavit is Dorothy Stovall, Aiken does state that police were investigating the murder of Stovall when they interviewed him, and police reports of those initial interviews have Aiken referring to Lockett's victims as Stovall and another "white man."

would be home soon.   Thus, because Johnston did not go missing until late August 1985, he could not have been the alleged murder victim Aiken referred to in his affidavit.

**{¶22}** Judgment affirmed.

It is ordered that appellee recover of said appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MELODY J. STEWART, PRESIDING JUDGE

ANITA LASTER MAYS, J., CONCURS;
SEAN C. GALLAGHER, J., CONCURS IN JUDGMENT ONLY