[Cite as *State v. Wilson*, 2022-Ohio-2769.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                         :

    Plaintiff-Appellee,          :

                                 No. 110763

    v.                           :

CLARENCE WILSON,                       :

    Defendant-Appellant.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 11, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-635210-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Gregory Mussman, Jeffrey Maver, and Samantha Sohl, Assistant Prosecuting Attorneys, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Erika Cunliffe, Assistant Public Defender, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Clarence Wilson ("Wilson"), appeals his convictions and claims the following errors:

1. Clarence Wilson's convictions for murder, attempted murder and multiple counts of felonious assault are not supported by the weight of the evidence presented and thereby are contrary to his right of due process as protected by the 14th Amendment to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution.

2. The trial court should have granted Wilson a hearing on his motion for new trial in light of information that one of the jurors may have lied about his past interactions with Wilson where such a hearing may [have] demonstrated this juror could not have fairly decided this case.

3. The trial court should have granted Wilson a hearing based on the other grounds raised in his new trial motion.

4. The trial court should have granted Wilson's request for an in-camera review of grand jury testimony where the record demonstrated it was likely that false information from a witness led to Wilson's indictment.

{¶ 2} We affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} On October 10, 2018, at approximately 10:40 p.m., someone driving a red Dodge Dart fired several gunshots into a crowded parking lot of a convenience store located at 18121 Euclid Avenue in Cleveland, Ohio. One of the gunshots struck and killed a woman named Tiarra East ("East"), who was congregating in the parking lot with members of her extended family following the death of her grandmother. A second gunshot struck April Glenn ("Glenn") in the arm, causing serious injuries requiring multiple surgeries. Surveillance cameras at the convenience store captured the shooting on film, but the driver's face could not be seen. Wilson was subsequently identified by witnesses as the driver of the red Dodge Dart, and one witness, Britney Brown ("Brown"), identified him as the shooter.

{¶ 4} Wilson was subsequently charged with one count of aggravated murder, one count of murder, one count of attempted murder, eight counts of felonious assault, two counts of improperly handling firearms in a motor vehicle, three counts of discharging a firearm on or near a prohibited premises, one count of having weapons while under disability, and one count of vandalism. The case proceeded to a jury trial on all counts except for the having weapons while under disability charge, which was tried to the bench.

{¶ 5} Glenn testified that on October 10, 2018, her family was assembled to grieve the passing of her grandmother. (Tr. 365.) Her grandmother's house was located near the convenience store, and the family was congregating in the store parking lot when someone driving a red Dodge Dart suddenly appeared and fired several gunshots across the parking lot. (Tr. 341, 366.) Surveillance video of the shooting, which was admitted into evidence, shows the red Dodge Dart in pursuit of a white Chevy Malibu. The white Chevy Malibu drove through the parking lot in an apparent attempt to escape the shooting.

{¶ 6} After the red Dodge Dart had left the scene, members of the Glenn family discovered that East and Glenn had both been shot. The father of East's children drove her to the hospital where she was pronounced dead. Glenn was transported to the hospital by EMS. None of the witnesses in the parking lot claimed to have seen the individuals who participated in the shooting.

{¶ 7} Brown testified that she entered the red Dodge Dart with Wilson at the Cleveland Motel shortly before the shooting. (Tr. 241-242.) The Cleveland Motel is

located at 17027 Euclid Avenue in Cleveland, Ohio, not far from the convenience store. (Tr. 536.) Brown was living and working as a prostitute at the Cleveland Motel in October 2018, and Wilson was her "dope man," from whom she purchased crack cocaine. (Tr. 241.)

{¶ 8} According to Brown, Wilson drove the red Dodge Dart while she smoked crack cocaine in the passenger's seat. (Tr. 242-243.) Shortly after she started smoking, Wilson fired several gunshots into the crowded parking lot at the convenience store. Brown looked at him and said "I hope you didn't kill nobody standing there." (Tr. 243.) He replied, "You cool? You cool?" Thereafter, they remained silent in the car until they returned to the Cleveland Motel. (Tr. 243.)

{¶ 9} Brown explained that Wilson did not intend to shoot either East or Glenn. He was trying to shoot Jaquan Jones ("Jones"), who was driving the white Chevy Malibu depicted in the surveillance video as the car followed by the red Dodge Dart. (Tr. 242-243.) Jones testified that he was the driver of the white Chevy Malibu and that he drove through the convenience store parking lot to escape the gunshots being fired at him from the red Dodge Dart behind him. (Tr. 334.)

{¶ 10} Brown returned to her room at the Cleveland Motel after the shooting and "played like nothin' happened." (Tr. 245.) Later that night, Wilson called her on the phone. (Tr. 250.) Unbeknownst to Brown, Wilson recorded the conversation, which was retrieved by police during the investigation and admitted into the evidence as state's exhibit No. 700. During the recording, which lasts approximately one minute, Brown tells Wilson, "My body is numb." She also tells him that she is

"depressed." (State's exhibit No. 700.) In the short recording, Wilson is heard twice asking, "Honestly, I had nothin' to do with that, right?" (Tr. 251, state's exhibit No. 700.)

{¶ 11} Brown admitted that she initially told police that she was not in the car with Wilson when he committed the shooting, claiming instead that he confessed to her after the fact. She asserted that although her initial report to police was not accurate, she was telling the truth at trial. She also stated that Wilson's mother offered to pay her if she would not testify, but she rejected the money. (Tr. 248.) She explained, "But me and him know the truth. So that's why I'm testifying." (Tr. 247.)

{¶ 12} Brown testified that DeAngelo Ricks ("Ricks") was her best friend. Ricks testified that the Cleveland Motel is a dirty place where people go for prostitutes and drugs. She explained that people often trade the use of a car for "a girl" or "for drugs." (Tr. 485.) She stated, "We give a guy or a girl some crack, they give us a car." (Tr. 485.) The car exchanged in the transaction is referred to as a "crack rental." (Tr. 485.) Ricks obtained a red Dodge Dart as a crack rental on the night of the shooting, but she did not drive it; she left it with Wilson. (Tr. 483, 485-486.) According to Ricks, a white man associated with one of her clients owned the Dodge Dart. (Tr. 488.)

{¶ 13} In October 2018, Diane Washington ("Diane") frequented the Cleveland Motel and was addicted to crack cocaine. (Tr. 406.) She was getting high with Brown on the night of the shooting when Wilson entered the room with "some

white guy." (Tr. 407.) Brown told Washington to "chill" with the white guy until she and Wilson returned. (Tr. 407.) Washington testified that she observed Brown and Wilson leave in the red Dodge Dart. (Tr. 408.) Washington further stated that when they came back, neither of them said anything and Brown was "acting weird." (Tr. 412.)

{¶ 14} Wilson was interviewed by Detective Kathleen Carlin ("Det. Carlin") following his arrest. The interview was recorded, and the videorecording was entered into evidence. During the interview, Wilson told Det. Carlin that he had not been near the Cleveland Motel since the summer of 2018, and he denied being there on the night of the shooting. Wilson also denied knowing Diane Washington. (Tr. 407.) Finally, Wilson told Det. Carlin that he could not have committed the shooting because he was at his mother's home that night watching a show called "Empire" and doing his laundry. Yet cell phone records established that Wilson was in the vicinity of the Cleveland Motel and the convenience store where the shooting transpired between 10:31 and 10:55 p.m. (Tr. 641.) The shooting itself occurred between 10:40 and 10:42 p.m. (Tr. 633.) Thus, Wilson's cell phone records placed him in the vicinity of the scene of the crime.

{¶ 15} The jury found Wilson guilty of all counts except for Counts 1 and 3, which alleged aggravated murder and attempted murder, respectively. The court sentenced Wilson to 36 years to life in prison. He now appeals his convictions.

## II. Law and Analysis

## A. Manifest Weight of the Evidence

{¶ 16} In the first assignment of error, Wilson argues his convictions are against the manifest weight of the evidence.

{¶ 17} A manifest weight challenge questions whether the state met its burden of persuasion at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. A reviewing court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "A conviction should be reversed as against the manifest weight of the evidence only in the most 'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Burks*, 8th Dist. Cuyahoga No. 106639, 2018-Ohio-4777, ¶ 47, quoting *Thompkins* at 387.

{¶ 18} Wilson contends that Brown was the only witness who identified him as the shooter and that she lacked credibility because she, herself, was a suspect in the murder and had a motive to implicate him in order to exonerate herself. Wilson also asserts that she lied to police when she denied being in the car with Wilson at the time of the shooting. He asserts that his alleged motive, i.e., that he had a "beef"

with Jones, was not corroborated by other evidence and that the police had "tunnel vision" when they were investigating the shooting and failed to follow other leads.

{¶ 19} Brown was not an exemplary witness. She is a former prostitute and crack addict, and she admittedly lied to police when they first questioned her about the shooting. By lying about her presence in the Dodge Dart at the time of the shooting, Brown attempted to distance herself from the murder. But just because Brown was a prostitute, who sought to disassociate herself from the event, does not mean that she committed the murder.

{¶ 20} As previously stated, the surveillance video shows that the person who fired the shots that killed East and injured Glenn was driving a red Dodge Dart and was following a white Chevy Malibu. Brown testified that Wilson fired the shots while he was driving the red car. Although Brown was not an ideal witness, her testimony that Wilson was the driver of the red Dodge Dart was corroborated by two other witnesses: Ricks and Washington. Ricks testified that the red Dodge Dart was owned by an unknown white man, who associated with one of her clients. Washington testified that she waited with an unknown white man while Wilson and Brown left in the red Dodge Dart. The testimonies of Ricks and Washington were consistent with each other and corroborated Brown's testimony that Wilson was driving the red Dodge Dart at the time of the shooting.

{¶ 21} Brown testified that Wilson did not intend to shoot either East or April; Jones was his target. Jones confirmed at trial that he was driving the white Chevy Malibu and that he drove through the convenience store parking lot to escape

the gunshots being fired at him from the red Dodge Dart. Although Jones denied having "a beef" with Wilson, Jones's testimony nevertheless corroborates Brown's testimony that Jones was Wilson's intended target.

{¶ 22} Wilson denied he was the shooter during his recorded interview with Det. Carlin. However, many of the statements he made during the interview were contradicted by other evidence. For example, during the recorded interview Wilson initially denies knowing Jones. However, later in the interview, he acknowledges that he not only knows Jones, but he corrects Det. Carlin's pronunciation of his name. And, as previously stated, Jones testified that he and Wilson knew each other. (Tr. 331.) Therefore, Wilson's claim that he did not know Jones is belied by the evidence. Moreover, his attempt to disassociate himself from Jones, who was driving the white Malibu at the scene of the shooting, demonstrates an attempt to distance himself from the shooting.

{¶ 23} Wilson also denied knowing Washington, who testified that she saw Wilson and Brown drive away in the red Dodge Dart shortly before the shooting and return in the same car directly after the shooting. (Tr. 406-407.) Wilson's denial that he knows Washington is another attempt to distance himself from the red Dodge Dart, which was clearly involved in the shooting.

{¶ 24} Moreover, Wilson denied being at the Cleveland Motel on the night of the shooting. During the recorded interview, Wilson tells Det. Carlin that he has not been to the Cleveland Motel since the summer of 2018 and that he was at his mother's house doing laundry at the time of the shooting. Yet, Wilson's cell phone

records demonstrate that he was in the vicinity of the Cleveland Motel and the convenience store where the shooting took place between 10:31 and 10:55 p.m. (Tr. 641.) The shooting itself occurred between 10:40 and 10:42 p.m. (Tr. 633.) Therefore, despite Wilson's statement to the contrary, objective evidence places him at the scene of the crime.

{¶ 25} Further, Wilson recorded a telephone conversation between himself and Brown after the shooting wherein he twice asserts that he "had nothin' to do with that, right?" (Tr. 251, state's exhibit No. 700.) The recorded conversation, which was played for the jury and was admitted into evidence, shows consciousness of guilt. If Wilson were truly not involved with the shooting, he would have had no reason to record a phone conversation with Brown proclaiming his innocence. Therefore, although Wilson denies he was present at the shooting, the greater weight of the evidence established that he was there and that he was the shooter. And even though Brown was not an ideal witness, the testimony from Ricks and Washington as well as the cell phone records placing Wilson in the vicinity of the crime scene corroborate Brown's testimony that Wilson fired the gunshots into the convenience store parking lot that killed East and injured Glenn. We, therefore, cannot say that this is a case where the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶ 26} The first assignment of error is overruled.

## B. Motion for New Trial

{¶ 27} In the second assignment of error, Wilson argues the trial court erred in denying his motion for new trial.[1] Wilson contends a new trial was warranted due to the misconduct of Juror No. 8. In the third assignment of error, he argues the trial court further erred in denying the motion for new trial, which he asserts was also warranted due to "unfair surprise" caused by the testimonies of Brown and Ricks as well as the undisclosed promises of immunity for Brown. We discuss these assigned errors together because they are both governed by Crim.R. 33(A).

{¶ 28} Crim.R. 33 provides, in relevant part:

---

[1] The parties submitted post-hearing briefs to address the question of whether Wilson's motion for new trial was timely filed. After reviewing the parties' briefs and the applicable law, we find that the motion was timely filed. Crim.R. 33(B) provides that motions for new trial "shall be filed within fourteen days after the verdict was rendered[.]" The rule does not define when the verdict is "rendered." In *State v. Vulgamore*, 4th Dist. Ross No. 19CA3686, 2021-Ohio-3147, ¶ 22, the Fourth District applied Black's Law Dictionary's definition of the term "render judgment" and concluded that a verdict is rendered for purposes of Crim.R. 33(B) when the court officially announces the verdict is open court and on the record.

We are not bound by the Fourth District's precedent, and no other court has adopted this approach. Indeed, this court has historically calculated the time for filing motions from new trial from the date the verdict is journalized. *See, e.g., State v. Powell*, 8th Dist. Cuyahoga No. 109897, 2021-Ohio-2440, ¶ 16; *Fairview Park v. Ricotta*, 8th Dist. Cuyahoga No. 66850, 1995 Ohio App. LEXIS 4066 (Sept. 21, 1995). *See also State v. Johnston*, 39 Ohio St.3d 48, 58, 529 N.E.2d 898 (1988)(holding that motion for new trial based on newly discovered evidence must be filed within 120 days "after journalization of the verdict.").

We believe that calculating the days from the date of journalization promotes consistency and predictability. It also follows the general rule that a court speaks only through its journal and not by oral pronouncement. *See State v. Bryant*, Slip Opinion No. 2022-Ohio-1878, ¶ 23.

Wilson filed his motion for new trial 15 days after the verdict was pronounced in open court but only 7 days after the verdict was journalized. We, therefore, conclude that his motion for new trial was timely filed.

(A) Grounds. A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

> (1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;

> (2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;

> (3) Accident or surprise which ordinary prudence could not have guarded against; * * * .

* * *

{¶ 29} The decision whether to grant or deny a motion for a new trial is within the sound discretion of the trial court and will not be overturned absent an abuse of discretion. *State v. Gilbert*, 8th Dist. Cuyahoga No. 106358, 2018-Ohio-3789, ¶ 25, citing *State v. Schiebel*, 55 Ohio St.3d 71, 76, 564 N.E.2d 54 (1990). "A court abuses its discretion when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the legally permissible range of choices." *State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, ¶ 19. An abuse of discretion may be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.) When applying the abuse of discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Vannucci v. Schneider*, 2018-Ohio-1294, 110 N.E.3d 716, ¶ 22 (8th Dist.).

{¶ 30} Wilson first argues his substantial rights were prejudiced by juror misconduct. In determining whether a defendant's substantial rights have been prejudiced due to misconduct, courts conduct a two-step inquiry. *State v. White*, 8th Dist. Cuyahoga No. 110452, 2022-Ohio-2130, ¶ 65. First, the court will determine whether juror misconduct occurred. *Id.* If juror misconduct is found, the court must then determine whether the misconduct materially affected the defendant's substantial rights. *Id.*

{¶ 31} In determining whether juror misconduct has occurred, we start with the premise that juror misconduct will not be presumed. *Professional Solutions Ins. Co. v. Novak, L.L.P.*, 8th Dist. Cuyahoga No. 108839, 2020-Ohio-4829, ¶ 69. To the contrary, because the law presumes proper conduct on the part of the jury, juror misconduct must be affirmatively demonstrated. *Id.*; *see also State v. Boykin*, 2d Dist. Montgomery No. 24479, 2012-Ohio-1090.

{¶ 32} In *Boykin*, the Second District upheld a trial court's denial of a defendant's motion for new trial under facts similar to those presented here. The defendant's brother informed the court by way of an affidavit in support of a motion for new trial that one of the jurors had prior interactions with the defendant and the defendant's family. The brother further averred that the juror also may have had contact with the victim's family. *Id.* at ¶ 5.

{¶ 33} The defendant's brother was present during the trial but did not share the information about the juror's contacts until after the jury had rendered its verdict. *Id.* at ¶ 18. The defendant filed a motion for new trial after the verdict,

claiming his substantial rights were violated. In affirming the denial of the motion for new trial the Second District explained that "had the matter been brought to the trial court's attention during the trial, the parties could have conducted an examination into the matter." *Id.* at ¶ 18. The court further noted that, during voir dire, both the trial court and the prosecutor inquired as to whether any of the prospective jurors knew either the defendant or the victim, and no juror responded affirmatively to either question. Moreover, the court found that the brother's statement that the juror "probably" knew the defendant and that there was a "strong possibility" that the juror knew him and his family was not sufficient to establish affirmative evidence of misconduct. *Id.* at ¶ 19.

{¶ 34} Wilson contends his substantial rights were prejudiced because Juror No. 8 was the assistant principal of the high school he attended nearly ten years earlier and that, as assistant principal, Juror No. 8 disciplined him and caused him to be expelled from school. He now claims that Juror No. 8 must have remembered him and been prejudiced against him. However, as in *Boykin*, the trial court asked the jurors during voir dire whether any of the jurors knew any of the parties involved in the case, including Wilson. (Tr. 51.) No juror responded affirmatively to the question. (Tr. 51.) The court also asked the jurors whether anyone had any personal interest in the outcome of the case or whether anyone had any prejudice, explaining that such disclosures ensure that the defendant receives a fair trial. (Tr.59, 93.) Again, no jurors responded affirmatively to the questions.

{¶ 35} As in *Boykin*, we find no affirmative evidence of any misconduct on the part of Juror No. 8 in failing to respond affirmatively to these questions. As an assistant principal, Juror No. 8 must have interacted with thousands of students over the years and it is not unreasonable to conclude that he did not remember Wilson, with whom he had not interacted for nearly a decade. We do not presume juror misconduct; we presume proper conduct on the part of the jury. *Professional Solutions Ins. Co.*, 8th Dist. Cuyahoga No. 108839, 2020-Ohio-4829, at ¶ 69. In the absence of affirmative evidence of juror misconduct, we find that the trial court properly overruled Wilson's motion for new trial based on alleged juror misconduct.

{¶ 36} Wilson nevertheless contends the court should have granted a new trial based on the "unfair surprise" caused by testimonies of Brown and Ricks as well as the undisclosed promises of immunity for Brown. First, he contends he heard Brown state, for the first time at trial, that she was a passenger in the car when Wilson fired his weapon into the convenience store parking lot. He asserts that in the videorecording of Brown's police interview, she told police that Wilson confessed to her about having committed the murder because she was not with him when it occurred. At trial, Brown testified that she was in the car with Wilson when he fired his weapon into the convenience store parking lot. He now claims he was unfairly surprised by the change in her testimony. However, Wilson did not object to the alleged unfair surprise at trial even though the prosecutor indicated in opening statements that Brown was going testify that she was in the car with Wilson when he fired his weapon in the convenience store parking lot. (Tr. 203-204.) In fact, the

prosecutor explained during opening statements that Brown changed her story and that although she originally lied to police about not being present, she later admitted that she was present. (Tr. 204.) Yet, defense counsel did not object on the basis of unfair surprise.

{¶ 37} In the state's brief in opposition to the motion for new trial, the state explains that although Brown's trial testimony was inconsistent with her initial police interview, her new version of the events was communicated to defense counsel. The fact that defense counsel did not object to the alleged surprise at trial suggests the state's claim that it disclosed Brown's revised statement to the defense is true. But regardless of whether the revised statement was disclosed, a witness's prior inconsistent statement is not a basis for a new trial. This is not a case where the witness, herself, was not disclosed prior to trial. Allowing an undisclosed witness to testify at trial may constitute unfair surprise, but that is not what happened here. Witnesses often provide testimony that is inconsistent with their prior statements. Prior inconsistent statements are routinely used for impeachment purposes to attack the witness's credibility. To grant a new trial every time a witness provided testimony inconsistent with his or her prior statement would result in countless new trials.

{¶ 38} Wilson also claims he was unfairly surprised by Ricks's testimony. According to Wilson, Ricks told police that she and Brown rented the red Dodge Dart from an unidentified white man on the day of the incident. Wilson claims that before trial, Ricks also never placed him in the car on the night of the shooting. Yet,

at trial, Ricks testified that she observed Wilson and Brown drive away in the red Dodge Dart shortly before the shooting. However, Wilson did not object to this alleged surprise at trial, and the state maintains the substance of Ricks's trial testimony was communicated to defense counsel in advance of the trial. Moreover, the state identified Ricks as a witness before trial. Witness testimony does not always go as expected. But, as previously stated, minor differences between prior statements and trial testimony is not a basis for a new trial.

{¶ 39} In *State v. Fitzgerald*, 8th Dist. Cuyahoga No. 94916, 2011-Ohio-719, this court affirmed the denial of a motion for new trial based on the alleged surprise in the testimony of two witnesses. In affirming the denial of the motion for new trial, this court noted that the defendant did not object to the alleged surprise testimony and, in any event, any credibility determinations about the witnesses' testimony were for the jury to decide. *Id.* at ¶ 26. Here, the defense did not object to the alleged surprise testimony at trial. And, the jury heard evidence that Brown had been a suspect in the shooting before she implicated Wilson. They were, therefore, aware that she had a motive to blame him in order to exonerate herself. Moreover, the defense could use any prior inconsistent statements for impeachment purposes, but prior inconsistent statements are generally not grounds for a new trial.

{¶ 40} Wilson further asserts he was surprised to learn at trial that Brown received immunity in exchange for her testimony. However, there is no evidence that Brown was offered immunity in exchange for her testimony. Moreover, defense counsel questioned Brown about receiving immunity on cross-examination, and she

denied receiving immunity. (Tr. 281.) Therefore, there is no basis on which to conclude that Wilson was unfairly surprised or prejudiced by the supposed immunity offered to Brown. We, therefore, cannot say that the trial court abused its discretion in denying Wilson's motion for new trial.

{¶ 41} The second and third assignments of error are overruled.

### C. Grand Jury Proceedings

{¶ 42} In the fourth assignment of error, Wilson argues the trial court erred in denying his request for an in camera review of the grand jury proceedings. He contends that Brown's inconsistent statements to police regarding her absence or presence in the red Dodge Dart at the time of the shooting and her prior statement regarding the presence of an individual identified as "T" at the time of the shooting suggests that Wilson was probably indicted based on false and/or fabricated information. Wilson asked the trial court to review the transcript of the grand jury proceedings to determine if the variance in Brown's testimony violated his rights to due process and a fair trial.

{¶ 43} Grand jury proceedings are secret, and a defendant has no right to an inspection of grand jury transcripts unless "the ends of justice require it and there is a showing by the defense that a particularized need for the disclosure exists which outweighs the need for secrecy." *State v. Greer*, 66 Ohio St.2d 139, 420 N.E.2d 982 (1982), paragraph two of the syllabus. A "particularized need" is established "when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial." *State v. Sellards*, 17 Ohio St.3d 169,

173, 478 N.E.2d 781 (1985); *Greer* at paragraph three of the syllabus. Determining whether a particularized need exists is a matter within the trial court's discretion. *Greer* at paragraph one of the syllabus.

{¶ 44} Wilson failed to demonstrate a particularized need for an in-camera review of Brown's grand jury testimony. Although Brown's initial statement to police was not consistent with her trial testimony, there is no evidence that her trial testimony was inconsistent with her grand jury testimony. "[T]he mere possibility of inconsistent testimony does not rise to the level of a particularized need that would warrant the disclosure of grand-jury testimony." *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 396, citing *State v Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 44 (holding that a speculative claim that the grand jury testimony might have contained material evidence does not establish a particularized need).

{¶ 45} Although Brown's trial testimony differed from her original statement to police, she revised her statement to police before trial. Thus, whether Brown provided false testimony before the grand jury is purely speculative and does not warrant an in-camera inspection of her grand jury testimony. Therefore, the trial court acted within its discretion in denying her request for an in-camera review of the grand jury proceedings.

{¶ 46} The fourth assignment of error is overruled.

{¶ 47} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

LISA B. FORBES, P.J., and
CORNELIUS J. O'SULLIVAN, JR., J., CONCUR